[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 16, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-14409

_____

D. C. Docket No. 03-00338-CV-BH-M

STEPHANIE POIROUX SNOW, by and through her father
and best friend, Martin J. Snow, as administrator
of the estate of Stephanie Leigh Snow,
MARTIN J. SNOW, as administrator of the estate of
Stephanie Leigh Snow,

Plaintiffs-Appellants,

versus

CITY OF CITRONELLE, AL,
CLARENCE PARKER,
CONRAD REID,
CLINT JORDAN,
MARSHALL CHENNAULT, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(August 16, 2005)

Before CARNES and PRYOR, Circuit Judges, and FORRESTER[*], District Judge.

PRYOR, Circuit Judge:

The issue presented in this appeal is whether city officials were deliberately indifferent to a strong likelihood that Stephanie Poiroux Snow (Poiroux) would commit suicide while in custody at the jail of the City of Citronelle, Alabama. Martin Snow, as administrator of his daughter's estate, filed this suit against the City, its mayor, and several employees of the police department. Snow alleged violations of his daughters's rights under the Eighth and Fourteenth Amendments to the United States Constitution and a claim for wrongful death under Alabama law. The district court granted summary judgment to all defendants on the federal claims and dismissed the state-law claims without prejudice. Because Snow presented evidence that Officer Marshall Chennault told Snow and Snow's wife, Esther, that Poiroux was suicidal and that Officer Chennault had information that Poiroux had recently attempted to slit her wrists, a genuine issue of material fact exists regarding Officer Chennault's knowledge that there was a strong likelihood that Poiroux would commit suicide. We, therefore, reverse the summary judgment entered against Snow's claim as to Officer Chennault. We affirm the summary judgment as to the federal claims against the remaining defendants, but we vacate

[*] Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

the order of dismissal of the state-law claims. Although we reinstate Snow's state-law claims, we express no opinion on the merits of those claims.

## I. BACKGROUND

Because summary judgment was entered against the plaintiff, we set forth the facts, drawn from the evidence presented, in the light most favorable to Snow. See, e.g., Swint v. City of Waddell, 51 F.3d 988, 992 (11th Cir. 1995).

On the evening of June 2, 2001, Poiroux was arrested for driving under the influence of alcohol or drugs after she was involved in an automobile accident with Clarence Parker, Chief of Police of the City of Citronelle. Officer Keith Miller, who responded to the scene of the accident, observed that Poiroux was unsteady and her speech was slurred. Poiroux denied drinking alcoholic beverages, but failed the field sobriety tests. She was arrested and transported to the City of Citronelle Police Station.

At the police station, Poiroux was placed in the female holding area, and then placed into a cell after she let herself out of the holding area. Officer Jason Blankinchip, who assisted Miller at the accident scene, had to force Poiroux, who was approximately six feet tall and weighed 150 to 160 pounds, into the cell. After a few minutes in the cell, Poiroux took off her shoe and began to beat it on the walls and the door, and Poiroux stated that she wanted to get out of jail. Poiroux

3

then climbed on the top bunk bed in the cell and began to hit the light fixture with her shoe. She ignored requests to stop this behavior and was charged with destruction of city property.

After ten to fifteen minutes, when Poiroux had become calm, Miller moved her back into the holding area. In the holding area, Poiroux began crunching a Pepsi can. Miller and Blankinchip then went into the room and removed the can and all other materials. When asked why she had been crunching the can, Poiroux responded that she was angry.

After Poiroux complained of seizures, the emergency medical unit was called. Poiroux's vital signs were normal, but Poiroux continued to complain of seizures and stated that she wanted to go to the hospital. Officer Clint Jordan took Poiroux to Springhill Memorial Hospital.

At Springhill Memorial, Poiroux was seen initially by a triage nurse. Jordan overheard Poiroux tell the nurse that she had experienced a seizure early that night, was taking prescription medications, and suffered from migraine headaches and asthma. Jordan also overheard Poiroux tell the nurse that she had tried to overdose on medicine in the past. Poiroux was next examined by a doctor, who found nothing physically wrong with her, but stated that, in the light of Poiroux's comments about her overdose attempt, she might need to go to Mobile Infirmary.

4

Poiroux was released from Springhill Memorial with no medications and no instructions.

Because Springhill Memorial was unable to take blood and urine samples, Jordan transported Poiroux to USA Medical Center emergency room for blood and urine samples. After a nurse took the samples, Poiroux was seen by an emergency room doctor. Jordan again overheard Poiroux tell the doctor that she had seizures, migraines, and asthma, she was on a number of medications, and she had attempted suicide by overdose in the past. Jordan did not hear when the overdose had taken place.

At USA Medical Center, Dr. Wan ordered tests and contacted Mobile Mental Health to have someone see Poiroux, but Mobile Mental Health would not send someone to see Poiroux while she was under arrest. After he received the test results, Dr. Wan prescribed some medications for Poiroux. Jordan was given specific written information regarding how and when the medication should be dispensed. Poiroux was released from USA Medical Center, and Jordan transported her back to jail.

Poiroux's outpatient records from USA Medical Center show that Poiroux told a doctor or nurse that she had attempted suicide four times in the past and that she had suicidal ideation. Dr. Wan, the emergency room doctor at USA Medical

5

Center, testified at his deposition that ordinarily either he or the nurse would have told the officer about the suicidal ideation of the patient, but Wan had no personal recollection of Poiroux or of communicating that information to Jordan. Jordan denies that any information concerning possible suicide was communicated to him by the medical personnel at USA Medical Center, and he denies seeing any of Poiroux's outpatient records.

At the jail, Jordan turned Poiroux, who was crying and upset, over to Dispatcher Yvonne Willman and Officer Chennault. Jordan told the dispatcher and Chennault to watch Poiroux because she had been in an automobile accident and had been given medication at the emergency room. Jordan also gave Chennault the written prescriptions and instructions from the doctor. Jordan ended his shift and went home. He had no further involvement with Poiroux.

Chennault then placed Poiroux in the female holding area. A few minutes later, Chennault allowed Poiroux to make several telephone calls from the dispatcher's office. He then brought Poiroux back to the holding area where she began to beat on the door. Because he thought that she was mentally unstable, Chennault called Poiroux's parents and asked them to take custody of her. Chennault spoke first with Poiroux's mother and then her father. The Snows testified at their depositions that Chennault told them Poiroux was suicidal. The

6

Snows did not agree to pick up Poiroux, but they agreed to bring her medications to the jail.

After he ended the call with Poiroux's parents, Chennault looked into the holding area and saw Poiroux climbing on the sink in cell number two. Chennault got Poiroux off the sink and locked the door to cell number two, at which point, Poiroux became upset and charged at Chennault. After a struggle, Chennault managed to close the door to the holding area. Poiroux then began beating on the window with the telephone receiver. When Chennault entered the holding area to get her to stop, Poiroux tried to hit him with the receiver. After another struggle, Chennault sprayed Poiroux in the face with pepper spray to subdue her. Poiroux immediately stopped struggling and was placed in the shower to be rinsed. Chennault's wife, who was present at the jail, helped Poiroux out of her dress and into a blanket so that the dress could be dried.

Several hours later, Poiroux's parents arrived with her medication and spoke with Chennault. Chennault told the Snows he thought their daughter was mentally unstable, he was having difficulties with her, and he had to use pepper spray to subdue her. The Snows testified that Chennault also told them Poiroux was suicidal. The Snows declined to take Poiroux home. At some point during his shift, Chennault called the Washington County jail, and a jailor there told

7

Chennault that, sometime within the last month, Poiroux had tried to cut her wrist while at the Washington County jail and had been troublesome. Chennault went off duty approximately one hour after meeting with the Snows and did not have any further problems with Poiroux.

There is no evidence that Chennault told any official of the jail that he thought Poiroux was suicidal, and it is undisputed that Chennault did not monitor Poiroux as if she were suicidal. Had he believed that Poiroux was a suicide risk, Chennault stated that he would have told the dispatcher to check on Poiroux every fifteen minutes, removed items from the cell with which Poiroux could have harmed herself, and perhaps would have placed Poiroux in the drunk tank. Chennault also stated that, had he received information from USA Medical Center that Poiroux had suicidal ideation, he would have instructed that she be returned to the hospital for treatment and observation.

Chennault was replaced on duty by Miller. When Miller started his shift, Poiroux was asleep in the holding area. A little while later, the dispatcher notified Miller that Poiroux had taken down the shower rod in the bathroom and was using it to reach into cell number two, which was locked, and beating on the walls with it. Miller took the rod and replaced it in the shower. About ten minutes later, Poiroux again took the shower rod down. Miller returned to the holding area, took

8

the shower rod, and talked to Poiroux. After speaking with Miller, Poiroux took a shower and had a meal at approximately six o'clock.

At six o'clock, Willman's shift ended, and Eva Henderson came on duty as dispatcher. A couple of hours after the duty switch, Poiroux began repeatedly knocking on the window between the holding room and the dispatcher's office in an attempt to talk to Henderson. Henderson called Miller, who told Poiroux to stop knocking on the window or she would be locked in a cell. Miller then went into the docket room to do paperwork. Henderson remained in the dispatcher's office watching the cells through the monitors. One monitor was directed constantly on the holding area. Henderson observed Poiroux in the holding area at least every thirty minutes and sometimes more frequently. At some point, Henderson saw Poiroux sitting on the bunk in cell number one tearing strips of what appeared to be toilet paper.

At a few minutes before nine o'clock, Poiroux requested medication from Henderson and stated that she wanted to get out of jail. Henderson told Poiroux to lie down and that she would inquire about the medication. A few minutes after nine o'clock, Miller returned to the dispatcher's office and looked through the window to check on Poiroux. When he did not see her through the window, Miller went to look through the door of the holding area.

Miller found Poiroux hanging from the air conditioning vent above the sink. There is also testimony that Henderson discovered Poiroux hanging when she looked through the cell window. Poiroux hung herself with strips from a blanket and was in full view of the monitor. On the monitor, it appeared to Henderson that Poiroux was leaning over the sink to wash her face. Attempts to revive Poiroux were unsuccessful.

Snow, as administrator of Poiroux's estate brought this action against the City of Citronelle, the Mayor of the City of Citronelle, and several members of the City of Citronelle police department. Snow alleged violations of Poiroux's rights under the Eighth and Fourteenth Amendments for the officers' deliberate indifference to a substantial likelihood that Poiroux would commit suicide while at the City of Citronelle jail. The district court granted summary judgment to all defendants in their individual capacities on the grounds of qualified immunity. The district court found that the defendants did not violate Poiroux's constitutional rights, and, in the alternative, if her rights were violated, the law was not clearly established. The district court also granted summary judgment in favor of the City of Citronelle and the defendants in their official capacities because it found that Poiroux's rights were not violated. The district court declined to exercise supplemental jurisdiction over the remaining state-law claims and dismissed them

10

without prejudice. Snow appeals.

## II. STANDARD OF REVIEW

This Court reviews the grant of summary judgment by the district court de novo and applies the same legal standards as the district court. Crosby v. Monroe County, 394 F.3d 1328, 1331-32 (11th Cir. 2004). "Summary judgment is proper only when the evidence before the court establishes 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. at 1332 (quoting Fed. R. Civ. P. 56(c)). "All evidence must be viewed in the light most favorable to the nonmoving party." Id.

## III. DISCUSSION

Although Snow brought claims under both the Eighth and Fourteenth Amendments, "the Eighth Amendment prohibitions against cruel and unusual punishment do not apply to pretrial detainees," like Poiroux. Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994) (quoting Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1539 n. 3 (11th Cir.1994)). The key issue in this appeal, therefore, is whether Snow alleged facts sufficient to withstand summary judgment on his claim that the defendants were deliberately indifferent to a strong likelihood that Poiroux would commit suicide while at the City of Citronelle jail in violation of the Fourteenth Amendment. Snow faces a difficult burden.

11

"[I]n a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under . . . the . . . [F]ourteenth [A]mendment, the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's taking of his own life." Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005) (internal quotation marks and citation omitted). "To establish a defendant's deliberate indifference, the plaintiff has to show that the defendant had (1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] . . . that risk; (3) by conduct that is more than mere negligence." Id. (internal quotation marks and citation omitted). "[I]n a prison suicide case, deliberate indifference requires that the defendant deliberately disregard 'a strong likelihood rather than a mere possibility that the self-infliction of harm will occur.' '[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners.'" Id. (citations omitted). An officer "cannot be liable under [section] 1983 for the suicide of a prisoner who never had threatened or attempted suicide and who had never been considered a suicide risk." Id. at 1116 (internal quotation marks and citation omitted).

To resolve this appeal, we must address four matters. We first address why the district court correctly entered summary judgment in favor of five of the

12

defendants in their individual capacities.  Second, we address why the district court erred in entering summary judgment in favor of Officer Chennault.  Third, we explain why the district court correctly entered summary judgment in favor of the City and its employees in their official capacities.  Finally, we explain why we must reinstate Snow's claims under state law without deciding any issue about the merits of those claims.

### A.  The District Court Correctly Entered Summary Judgment for Jordan, Henderson, Parker, Reid, and Miller.

Snow sued Mayor Presnell and six members of the City of Citronelle police department in their individual capacities: Jordan, Chennault, Henderson, Parker, Reid, and Miller.  Snow does not appeal the summary judgment as to Presnell.  Of the remaining defendants, Snow's claims against Jordan, Henderson, Parker, Reid, and Miller fail because Snow has not presented any evidence that these five defendants had subjective knowledge of a strong likelihood that Poiroux would attempt to commit suicide.  Although Poiroux's emergency room records show a strong likelihood that she would attempt to commit suicide because Poiroux told the emergency room staff she had attempted suicide four times in the past and the doctor's notes show that she had suicidal ideation, there is no evidence that these defendants knew about that information.  There is no evidence that any of these five defendants suspected that Poiroux was suicidal.

13

The closest issue as to these five defendants involves Jordan, but there is insufficient evidence that Jordan was aware of a strong likelihood that Poiroux would commit suicide or that he acted with deliberate indifference to this likelihood. Jordan, who was the only officer to speak with medical personnel, stated that he was not informed of Poiroux's suicidal ideation. Jordan overheard Poiroux tell the medical personnel that she had attempted suicide in the past, but Jordan did not know when the attempt had taken place. The testimony of Dr. Wan, that he or the nurse ordinarily would have told an officer about a detainee's suicidal ideation, does not establish that Jordan had that knowledge, because Dr. Wan did not have any present recollection of Poiroux. Wan's testimony was nothing more than speculation. In addition, it is undisputed that Jordan did not see Poiroux's outpatient records. Viewed in the light most favorable to Snow, the only evidence presented to establish the first element regarding Jordan was his knowledge of Poiroux's previous suicide attempt, but this knowledge, without more, is not sufficient to put Jordan on notice of "a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." Cook, 402 F.3d at 1115.

No other defendant had contact with the medical personnel and could have learned of Snow's suicidal ideation from the doctors and nurses who treated Snow,

14

and Snow did not present other evidence that Henderson, Miller, Parker, or Reid had subjective knowledge of a risk of serious harm. The district court, therefore, correctly entered judgment against Snow on his claims against Jordan, Henderson, Miller, Parker, and Reid in their individual capacities.

*B. The District Court Erred in Granting Summary Judgment for Chennault.*

Whether Snow presented sufficient evidence to create an issue of fact with regard to Officer Chennault is another matter. Taken in the light most favorable to Snow, a jury could find that Chennault had subjective knowledge that there was a strong risk that Poiroux would attempt suicide and deliberately did not take any action to prevent that suicide. First, Chennault testified in deposition that he telephoned the Washington County jail, and a jailor told him that, sometime in the last month, Poiroux had tried to cut her wrist while in custody there and had given them a lot of trouble. Second, the Snows testified that Chennault told them Poiroux was suicidal. Third, it is undisputed that Chennault did not communicate any information regarding his belief that Poiroux was a strong suicide risk to anyone else at the jail. Finally, Chennault stated that he did not take the actions he would have taken had he regarded Poiroux as a suicide risk.

Chennault did not inform Henderson to check on Poiroux every fifteen minutes. Chennault did not remove items from the cells with which Poiroux could

15

have harmed herself. Chennault did not place Poiroux in the drunk tank, and Chennault did not return Poiroux to USA Medical Center for treatment and observation. In short, Chennault did nothing.

That evidence of Chennault's complete failure to take any action after Poiroux was returned to the jail from USA Medical Center creates a substantial issue about whether the suicide of Poiroux was avoidable. Although Henderson testified that she monitored Poiroux fewer than fifteen minutes before Poiroux's suicide, the jury could infer that Henderson and other employees would have been more vigilant had they been informed that Poiroux was suicidal. In addition, a jury could find that, if either Poiroux had been placed in the drunk tank and items she could have used to harm herself removed from her reach or Poiroux had been returned to USA Medical Center, then Poiroux would not have committed suicide.

Although Chennault denies telling the Snows or anyone else that he thought Poiroux was a suicide risk, the conflicting testimony creates an issue of fact for a jury to decide about Chennault's knowledge. Viewing the facts in the light most favorable to Snow, a jury could find that Chennault subjectively believed that there was a strong risk that Poiroux would attempt suicide and deliberately did not take any action to prevent her suicide. Those facts, if found by a jury, would establish a constitutional violation. Because, at the time of Poiroux's death, it was clearly

16

established that an officer's deliberate indifference to the risk of serious harm to a detainee is a violation of the Fourteenth Amendment, the district court erroneously granted summary judgment on Snow's claim against Chennault. McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).

### C. The District Court Correctly Entered Summary Judgment in Favor of the City and its Officials.

In addition, Snow sued the City of Citronelle and Parker, Reid, and Presnell in their official capacities. The district court properly granted summary judgment on these claims. "Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent," we address Snow's argument in relation to the City of Citronelle. Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991).

A municipality may not be held liable under section 1983 on a theory of respondeat superior. City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203 (1989). "'It is only when the "execution of the government's policy or custom . . . inflicts the injury" that the municipality may be held liable under [section] 1983.'" Id. (quoting Springfield v. Kibbe, 480 U.S. 257, 267, 107 S. Ct. 1114, 1119 (1987) (O'Connor, J., dissenting) (quoting Monell v. Dep't of Social Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38 (1978))). To hold the municipality liable, there must be "a direct causal link between a municipal policy

17

or custom and the alleged constitutional deprivation." Id. at 385.

Snow erroneously argues that the City of Citronelle should be liable because the failure of the city to have a suicide policy constituted deliberate indifference to a known, substantial risk of suicide. Although the jail did not have a written suicide policy, all of the officers stated that an unwritten policy existed regarding suicidal detainees. Even assuming the absence of any suicide policy, however, the evidence does not establish a causal link between Poiroux's suicide and the alleged lack of a suicide policy at the City of Citronelle jail. The evidence is undisputed that Chennault, the only officer who may have had knowledge that Poiroux presented a strong likelihood of suicide, did not communicate that information to his colleagues. The officers on duty, therefore, would not have known to put Poiroux on a suicide watch even if there was a policy. Furthermore, Chennault stated that, had he suspected Poiroux was suicidal, he would have taken the actions a suicide policy would require: he would have told the dispatcher to check on Poiroux every fifteen minutes, removed items from the cell with which Poiroux could have harmed herself, and placed Poiroux in the drunk tank. Because the record shows that Chennault believed he should have taken these actions if a detainee was suicidal and Snow does not argue that the Constitution required Chennault to do more, his failure to do so cannot be attributed to the alleged lack

18

of a suicide policy.

Neither can the municipality be held liable for failure to train, failure to supervise, or inadequate staffing. Snow has not presented any evidence that Poiroux's suicide is attributable to any of these alleged failures. The municipality, therefore, cannot be held liable, and the district court correctly entered summary judgment.

### D. The State-Law Claims Must Be Reinstated.

After the district court granted summary judgment on the federal claims, the court declined to exercise supplemental jurisdiction over Snow's state-law claims and dismissed them without prejudice. Because we reinstate Snow's federal claims, we must vacate the discretionary dismissal of the state-law claims, but we express no opinion on the merits of those claims. See Vaughan v. Cox, 343 F.3d 1323, 1334 (11th Cir. 2003). Because Snow concedes that his state-law claims against the City of Citronelle and Mayor Presnell should be dismissed, the state-law claims are reinstated as to all other defendants.

### IV. CONCLUSION

We reverse the summary judgment entered in favor of Chennault because there is an issue of fact regarding Chennault's subjective knowledge of a substantial likelihood that Poiroux would commit suicide. We affirm the summary

19

judgment as to all remaining defendants, because Snow did not present any evidence that the remaining defendants had subjective knowledge of a substantial likelihood of a suicide attempt, and Poiroux's suicide cannot be attributed to a failure of the City of Citronelle to have a suicide policy. Finally, we vacate the dismissal of Snow's state law claims as to all defendants, except the City of Citronelle and Mayor Presnell, but express no opinion on the resolution of those claims.

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.**