[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————

No. 12-15572

———————————

D.C. Docket No.   5:11-cv-00316-RS-EMT

ESTATE OF MAUREEN BEARDEN,
by James Bearden as personal representative of the
Estate and on behalf of the survivors
Elizabeth and Brooke Villella and James Bearden

Plaintiff - Appellee,

versus

RICK ANGLIN,
in his individual capacity,

Defendant - Appellant.

———————————

Appeal from the United States District Court
for the Northern District of Florida

———————————

(October 29, 2013)

Before PRYOR and BLACK, Circuit Judges, and RESTANI, [*] Judge.

---

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by designation.

PER CURIAM:

The Estate of Maureen Bearden ("the Estate") brought a § 1983 action against Frank McKeithen, the Sheriff of Bay County, Rick Anglin ("Anglin"), the jail administrator of the Bay County Jail, and Dr. Ronald Lippmann, a doctor at the jail, following the tragic suicide of Maureen Bearden ("Bearden") while she was in the jail's custody.   The district court initially granted qualified immunity to Anglin, who was sued in his individual capacity, but the court reversed its decision based on evidence of previous suicides at the jail over a period of fourteen years.   Because the Estate has failed to allege sufficient facts to establish that Anglin personally acted with deliberate indifference towards Bearden's serious medical needs, we reverse.

## I.    BACKGROUND

Anglin took over operations of the Bay County Jail in 2008, after a long-term contract with a private jail administrator ended.   One of the reasons for the county regaining control over the jail was a perceived lack of adequate mental health services.   These deficiencies may have contributed to three suicides between 1994 and 1997, as well as six suicides between 2000 and 2008.   At least three of these suicides were achieved through the use of a ligature, although few details of the suicides are on the record.   We know that one suicide occurred in a bathroom, and

2

all three involved cloth being used as the ligature.   Under private administration, the jail employed an offsite psychiatric service, often involving delays in service, but providing for transportation to other facilities for crisis care.   Anglin modified the psychiatric services offered at the jail, bringing services "in-house."   He hired some existing staff, including a licensed mental health counselor, as well as two individuals who had masters degrees in mental health counseling and a physician. The jail also was subject to a "Suicide Management/Risk Reduction Policy" that instructed each facility to develop a suicide prevention plan and that laid out minimum requirements of such a plan.   At the time of the incident at issue, no written plan had been created.

Bearden was booked into the Bay County Jail on January 25, 2009, one of several stays at the facility and approximately three months after the county resumed control of the facility.   At intake, Bearden informed jail staff that she had attempted suicide previously and was considering trying again.[1]   As a result, Bearden was placed on suicide precaution and referred to mental health staff.

She was seen over the course of her stay by both Dr. Lippmann and Mr. Jennings, although most contact appears to have been with Jennings.   The Estate alleges that many of the visits from Jennings were either very short or non-existent.

---

[1] Bearden had attempted suicide on at least three prior occasions, including jumping from a tower and a bridge.

3

Prior to her suicide, Bearden spent most of her time on suicide watch or medical observation, and she was placed in a solitary cell in medical observation with commissary and phone privileges during her final days.[2]

On March 22, 2009, Bearden committed suicide by hanging herself with her sheet, which she had woven through the metal grating on the cell door.  Only the outside portion of the grating was covered with a plexiglass-like covering.  During her final weekend, and in particular during her final day, she had been pounding, shouting, and talking to herself.  The Estate claims that this was in part because Bearden was to be transferred to the Florida State Hospital, where she had been sexually assaulted on a previous occasion.  During her final evening, Bearden gave a note to a jail nurse saying that she was planning on "hurting the people that has hurt me instead of myself."  A shift supervisor reported to the health services administrator that Bearden needed more attention and that she should be removed from the jail.  At some point, there was a break in Bearden's behavior for up to 20 minutes.  An inmate then alerted guards that she thought something was wrong, and an officer investigated, finding Bearden hanging by her neck, her lips blue.

The Estate initiated the present suit against several defendants, including

---

[2] All housing changes were ordered by Dr. Lippmann, the physician employed by the sheriff's office.  While on suicide precaution, Bearden was allowed to have only her mat, shroud, and blanket, with the exception of one day on which everything was taken from her except the suicide blanket.  At the time of her death, Dr. Lippmann had lifted these precautions.

4

Anglin, claiming that the defendants were liable under 42 U.S.C. § 1983 for failing to protect Bearden from herself.   Anglin moved for summary judgment based on qualified immunity, and the district court initially granted his motion.   Upon a motion to alter judgment, however, the district court reversed, finding that Anglin could be liable to the Estate based on his awareness of previous suicides at the jail. Anglin filed a timely appeal.

## II.     JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction in this 42 U.S.C. § 1983 action pursuant to 28 U.S.C. § 1331.   This court has jurisdiction pursuant to 28 U.S.C. § 1291 over the interlocutory appeal of the denial of qualified immunity as a collateral order under Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).   The court reviews a denial of qualified immunity de novo.   See Maggio v. Sipple, 211 F.3d 1346, 1350 (11th Cir. 2000).

## III.    DISCUSSION

"Under the doctrine of qualified immunity, government officials acting within their discretionary authority are immune from suit unless the official's conduct violates clearly established federal statutory or constitutional rights of which a reasonable person would have known."   Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) (internal quotation marks and brackets omitted).   To avoid

5

summary judgment on qualified immunity grounds, the plaintiff's allegations, supported by admissible evidence, must demonstrate both (1) a constitutional violation and (2) that the violation was clearly established.   See id.

A claim for failure to provide adequate medical care is based on a prisoner's right to be free from cruel and unusual punishment under the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 104–05 (1976).   "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."   Id. at 106.   To demonstrate deliberate indifference, a detainee must "prove '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'"   Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010) (alteration in original) (quoting Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005)).   "Thus, 'knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference.'"   Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1191 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730 (2002) (quoting Horn ex rel. Parks v. Madison Cnty. Fiscal Ct., 22 F.3d 653, 660 (6th Cir. 1994)).   As explained by the Supreme Court:

> a prison official cannot be found liable under the Eighth Amendment
> for denying an inmate humane conditions of confinement unless the

6

official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994).   Furthermore, a plaintiff must demonstrate "a strong likelihood, rather than a mere possibility, that suicide would result from a defendant's actions or inaction.   Thus, the mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners."   Tittle v. Jefferson Cnty. Comm'n, 10 F.3d 1535, 1540 (11th Cir. 1994) (internal quotation marks and citations omitted).

As a supervisor, Anglin can be liable for either his personal participation in the alleged constitutional violation or his actions as a supervisor in creating a custom or policy that caused his subordinates to commit the constitutional violation.   See Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).   "The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so."   Id.   "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."   Id.

Under this standard, perfect efforts are not required of jailers, and where the jail has standard operating procedures to protect at-risk detainees, these usually will

7

be sufficient to confer qualified immunity, even when aspects of the system are imperfect.   See Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir. 1990). Additionally, the lack of a written suicide policy, in and of itself, does not impose liability automatically.   See Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1271 (11th Cir. 2005).

In this case, there are no substantiated allegations that Anglin was present at the time that Bearden committed suicide or that he was involved personally in her care at the jail.[3]   As a result, the only possible basis for liability as to Anglin is in his role as a supervisor and jail administrator, establishing the anti-suicide procedures at the jail and overseeing their implementation.   The Estate faults Anglin for failing to create a suicide policy, changing the medical staffing plan to eliminate some off-site treatment, and maintaining cells with anchor points.

To establish knowledge of serious risk, the Estate points to Anglin's knowledge of the previous suicides at the Bay County Jail, all of which were prior to Anglin's assumption of control of the jail.   This was the key fact relied upon by the district court in altering its judgment.   There is no evidence on the record, however, as to whether the suicide rate was unusually high or whether the suicides were the

---

[3] The Estate contests in its brief the fact that Anglin did not personally know of Bearden.   The record citations, however, do not support a claim that Anglin was aware of Bearden's presence or treatment, and it is undisputed that he was not at the jail at the time of her death.   General, speculative allegations do not meet the knowledge standard for deliberate indifference cases.

result of the failure of a common aspect of the jail's anti-suicide program.   Without this type of information, Anglin could not have possessed personal knowledge of a serious risk to suicidal prisoners that was created by the jail's medical program so that he could be held to have purposefully or recklessly disregarded such risk. Additionally, these prior suicides occurred under the private administrator's system, portions of which had been adjusted.   Under the new policies, no suicides occurred that could have put Anglin on notice of serious risks.

Although it appears that Anglin was familiar with these incidents, at least somewhat, based on his role in overseeing the county's contract and planning the jail's transition, no evidence suggests that he had particular knowledge about how those inmates committed suicide so as to alert him of serious problems with the cells.   In fact, out of the three cases of suicides executed by a ligature device, at least one of them occurred in a manner substantially different from Bearden's suicide, namely in a bathroom rather than in a cell.   As a result, the district court and the Estate both misjudged the value of this knowledge in bolstering the Estate's claim.   These facts do not suggest that Anglin was aware of the potential suicide risk associated with the mesh door being used as an anchor point.   The Estate's position would impose a duty to suicide-proof virtually all cells, a duty not required by the Constitution.   Without knowledge of the particular serious risk at issue,

9

Anglin could not have been deliberately indifferent, and therefore no § 1983 action can be maintained.

Even if Anglin could be found to have been aware of the serious risk posed to Bearden, there is no information on the record to support a jury finding that Anglin's actions deliberately disregarded this risk and caused, at least in part, Bearden's death. It is undisputed that Anglin implemented a mental health program at the jail, albeit different from the one predating his arrival. The Estate argues that the mental health system was defective in that it did not permit offsite critical care and it was staffed by unqualified personnel. The Estate's challenge to the system raises at most negligence on the part of Anglin. The undisputed facts demonstrate that a screening program was in place through which a doctor made housing and privilege determinations, and it was this system that placed Bearden on suicide watch and ultimately in medical observation. Although the Estate believes that Dr. Lippmann should have been more involved in Bearden's care and should not have discharged her to medical observation, these allegations do not rise to the level of deliberate indifference to the safety of suicidal detainees, at least on the part of Anglin. Like in Popham, the jail had standard operating procedures for evaluating and housing suicidal detainees, albeit unwritten ones, and at most these procedures may have been designed or implemented in a negligent manner.

10

## IV.    CONCLUSION

Because the Estate has failed to put forward sufficient evidence from which a jury could conclude that Anglin was deliberately indifferent toward Bearden's risk of suicide, we hold that Anglin is entitled to qualified immunity.

REVERSED.

11