[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-13562
Non-Argument Calendar

_____

D.C. Docket No. 3:18-cv-00571-RV-EMT


JESSICA N. ROGERS,
as personal representative of the estate of
Jose F. Escano-Reyes and as parent and
natural guardian of Y C A minor child,

Plaintiff-Appellee,

versus


SANTA ROSA COUNTY SHERIFF'S OFFICE, et al.,

Defendants,

JOHN GADDIS,
in his official and individual capacity,
MICHELLE BAUMAN,
in her official and individual capacity,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(April 9, 2021)

Before WILLIAM PRYOR, Chief Judge, NEWSOM and ANDERSON, Circuit Judges.

PER CURIAM:

Deputies John Gaddis and Michelle Bauman of the Santa Rosa County Sheriff's Office appeal the denial of summary judgment based on qualified immunity. Gaddis and Bauman were on duty in the county jail when detainee Jose F. Escano-Reyes hung himself while under suicide watch. Jail policies required jailers to physically check on suicidal inmates every 15 minutes, but a video recording of the deputies' work area shows that neither deputy checked on Escano-Reyes on the morning of his death. Unobserved, Escano-Reyes twice tied his suicide prevention smock to a metal room divider in his cell and created a ligature into which he inserted his head ten times before asphyxiating himself. Jessica Rogers, as Escano-Reyes's representative, filed a third amended complaint that alleged the deputies' failure to check on him constituted deliberate indifference to his psychiatric needs under the Fourteenth Amendment and negligence under state law. The deputies do not dispute that they were negligent and have abandoned any challenge they could have made to the denial of summary judgment on Rogers's

2

state-law claim. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004). Because the evidence creates a substantial issue whether the deputies deliberately failed to take any action to prevent Escano-Reyes's suicide, we affirm the denial of qualified immunity to them on Rogers's claim of deliberate indifference.

## I. BACKGROUND

In January 2016, officers arrested Escano-Reyes for driving without a license and discovered that he had entered the United States illegally. Escano-Reyes was detained at the Santa Rosa County Jail awaiting removal. He was housed in the general population.

On April 2, 2016, Escano-Reyes told jail officials that he wanted to die and planned to commit suicide. Officers transferred Escano-Reyes to the medical unit, where he was placed on suicide watch. He received a suicide prevention smock to wear in lieu of outer and undergarments.

Four days later, officials moved Escano-Reyes to a private cell in the Admissions, Classification, and Release unit adjacent to the medical unit. Escano-Reyes was assigned to cell one, the only cell with a metal room divider.

Cell one was located within a few feet of the booking desk, but officers sitting at the desk did not have a clear line of sight into the cell. Consistent with jail policy and practice, the main window on the door of cell one was covered with a

3

velcro curtain. A sidelight for the cell door also was covered from the waist down with a plastic bag. The covertures shielded officers from viewing male inmates who were naked. To observe the inside of the cell, officers had to go to its door and look through the uncovered sliver of the sidelight.

The unit had separate surveillance video cameras for the booking desk and the doors into surrounding cells and for the interior of each cell. The video camera for cell one provided a view of its bed, sink, and the room divider. The camera transmitted to a monitor in the central control room. The booking desk did not have a monitor to observe the inmate inside cell one.

On April 6, 2016, Escano-Reyes's first day in cell one, he acted erratically. He paced in his cell, spat on the floor, and made delusional statements. He screamed repeatedly in Spanish that he needed to be killed and wanted to die. He "mule-kicked" his cell door, and he was strapped into a restraint chair from 11:15 p.m. to 1:10 a.m. "for his safety." The events were recorded in "incident reports."

On April 7, 2016, before Deputies Gaddis and Bauman began their shift at the booking desk, they were told about Escano-Reyes's incident reports and that he was on suicide watch. Regulations required jailers to maintain "direct observation"—that is, "continuous visual observation 24 hours each day"—with inmates. Fla. Model Jail Standard 1.14. The standards required that "any inmate who is identified by correctional staff as a suicide risk shall not be housed in a

'single cell' unless the inmate is observed by direct visual observation . . . 24 hours each day" and "shall include regular, documented physical checks by corrections officers and/or medical staff persons at intervals not to exceed 15 minutes." *Id.* Standard 5.4b. A general order, O-030II(D), also required supervising deputies to keep a suicidal inmate "under direct continuous observation with documented staggered 15-minute physical checks." But the jail interpreted the order loosely to require deputies to be near the inmate and to be "available and capable to do the 15 minute close watch checks."

The video recording of cell one on the morning of April 7, 2016, shows that Escano-Reyes put his head through a ligature he created ten times before hanging himself. At 9:00 a.m., about 45 minutes after waking, Escano-Reyes removed his suicide prevention smock and tied it around the room divider, but he immediately untied the smock and put it back on. Eight minutes later, Escano-Reyes removed his smock a second time and tied it around the divider. He paced around his cell naked, gestured oddly, yelled in Spanish, and stopped occasionally to look out his sidelight. At 9:40 a.m., Escano-Reyes put his head through a ligature he had created with his smock, pulled his head out, and then tightened the ligature. At 10:10 a.m., he put his head through the ligature a second time and, for five minutes, struggled to tighten the ligature around his neck. He took his head out of the ligature, retied it, put his head back through, and drew up his legs in an attempt

to dangle his body. He performed a similar process four more times, in the midst of which he moved his mattress pad onto the floor in front of the ligature. In between each attempt to hang himself, Escano-Reyes frenetically paced around his cell, yelled, and looked out his sidelight. At 10:26 a.m., Escano-Reyes put his head in the ligature for the last time and turned his body around several times to twist the ligature taut and to suspend his knees above the mat. He twitched briefly. At 10:44 a.m., a janitor glanced through the sidelight of cell one and notified Bauman, who was sitting alone at the booking desk, that Escano-Reyes was "hanging."

The contemporaneous video recording of the booking desk shows that Gaddis and Bauman never physically checked on Escano-Reyes. The two chatted and talked to jail employees who circulated though the booking area. Gaddis admitted that he falsely recorded that he physically had checked Escano-Reyes every 15 minutes. Gaddis also admitted that he examined his personal email account and his Facebook page.

After Rogers sued the deputies, discovery ensued during which both deputies testified that the safety of a suicidal inmate is "the most significant" and "most serious medical need" at the jail. The deputies admitted that they were expected to perform "staggered" physical checks on a suicidal inmate and to complete a "close watch form" that recorded they had observed the inmate every 15 minutes. The deputies admitted that they did not coordinate who or when they

would check on Escano-Reyes. A representative of the jail testified that when suicidal inmates yell, supervised deputies are expected to investigate the cause of the inmate's distress. The deputies testified that, on the morning of his death. Escano-Reyes shouted "continuously" for an hour or more, but neither knew the subject of his tirade because neither spoke Spanish.

Gaddis testified that there was a "very real possibility" Escano-Reyes would attempt suicide and "common sense" dictated he should have been observed every 15 minutes. The deputy described his "normal practice" as physically checking suicidal inmates who he had not seen at their cell door or heard in 15 minutes. He did not check on Escano-Reyes because he had yelled so much that morning, even though it was "possible he could be doing something" to harm himself while yelling. Gaddis stated that, had he physically checked Escano-Reyes, he was "hundred percent sure [he] would have seen" Escano-Reyes "trying to tie a knot in that suicide prevention garment" and "pacing the cell." The deputy stated that, had Escano-Reyes's shouting consisted of suicidal ideations, he would have moved Escano-Reyes to a different room, removed his garment, and strapped him into a restraint chair. But the deputy admitted that he was not "at all curious or concerned about what [Escano-Reyes] was saying" and that he tuned out the yelling without "looking over [at his cell] at all." Gaddis admitted that he had acted "deliberately," "knowingly," and "disregarded" Escano-Reyes's serious medical needs. The

7

deputy also agreed with the finding of an internal investigation that his inaction amounted to "willful neglect."

Bauman conceded that she lacked "regard for [Escano-Reyes's] life" and disregarded her duty to physically check him every 15 minutes. She admitted that she would have seen him "attempting to hang himself . . . a few times" had she timely observed him. She also admitted that she "willfully neglected . . . components of [her] responsibilities that morning."

The district court ruled that Gaddis and Bauman's argument for summary judgment based on qualified immunity "[wa]sn't . . . close." The district court stated that Rogers "easily prove[d]" that the deputies acted with deliberate indifference because they "testified that they subjectively knew that [Escano-Reyes] had a risk of serious harm and they admit to disregarding and 'willfully neglecting' that risk, thereby violating his constitutional rights." The district court ruled that "the right at issue was 'clearly established'" "[w]hether based on a materially similar case on point," or "the . . . exceptions" for conduct that obviously violates a detainee's constitutional rights.

## II. STANDARD OF REVIEW

We review *de novo* the denial of summary judgment based on qualified immunity. *Snow v. City of Citronelle, Alabama*, 420 F.3d 1262, 1268 (11th Cir. 2005). Summary judgment is appropriate when the evidence establishes that there

8

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To make that determination, we construe the evidence in the light most favorable to the nonmoving party. *Snow*, 420 F.3d at 1268.

### III. DISCUSSION

Gaddis and Bauman argue that they are entitled to qualified immunity. The deputies argue that the district court applied an incorrect standard to evaluate whether they acted with deliberate indifference to Escano-Reyes's psychiatric needs. The deputies argue that their inaction does not constitute deliberate indifference because Escano-Reyes had been placed "in a designated suicide watch cell and all impediments to suicide had been removed."

The district court applied the correct standard to evaluate the deputies' conduct. "The Due Process Clause of the Fourteenth Amendment guarantees pretrial detainees the right to basic necessities that the Eighth Amendment guarantees convicted persons." *Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008); *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396 (11th Cir. 1994). So detainees have a "right to be protected from self-inflicted injuries, including suicide." *Belcher*, 30 F.3d at 1396. An official who displays deliberate indifference to a detainee's taking of his own life may be liable for violating his substantive right to due process under the Fourteenth Amendment. *Gish*, 516 F.3d at 954.

"[D]eliberate indifference entails something more than mere negligence"; "it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To be deliberately indifferent, an official must have subjective knowledge of a risk of serious harm and "deliberately disregard a strong likelihood rather than a mere possibility, that the self-inflicted harm will occur." *Snow*, 420 F.3d at 1268; *see Gish*, 516 F.3d at 954–55. "Where prison personnel directly responsible for inmate care have knowledge that an inmate has . . . threatened . . . suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason v. Kemp*, 891 F.2d 829, 835–36 (11th Cir. 1990); *see Farmer*, 511 U.S. at 836 ("[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").

The district court did not err in determining that the evidence, taken in the light most favorable to Rogers, could lead a jury to find that Gaddis and Bauman knew of a strong risk that Escano-Reyes would attempt to harm himself and deliberately took no action to prevent his suicide. The deputies knew that Escano-Reyes was on suicide watch and had attempted to harm himself a few hours earlier. They heard Escano-Reyes yelling, but they ignored him. The deputies *never* physically checked Escano-Reyes, and Gaddis falsified records to conceal their

10

inaction. A jury could find that, had the deputies monitored Escano-Reyes, they could have prevented him from committing suicide and that their failure to perform the task assigned to them constituted deliberate indifference.

Gaddis and Bauman argue that they entitled to qualified immunity like the officers in *Goodman v. Kimbrough*, 718 F.3d 1325 (11th Cir. 2013), *Gish*, 516 F.3d 952, and *Cagle v. Sutherland*, 334 F.3d 980 (11th Cir. 2003). But the officers in those cases performed their assigned duties, albeit carelessly. In *Goodman*, we concluded that two officers tasked with monitoring inmates overnight were unaware that their inspection of the inmates through the windows of their cells instead of entering and examining their faces and armbands created a risk that a 67–year–old detainee suffering from dementia could be severely beaten by his cellmate. 718 F.3d at 1329–30, 1332–33. We concluded in *Gish* that an officer was not aware a suicidal arrestee would commit shoot himself using a loaded firearm in the front seat of the patrol car when the arrestee was sitting in the rear seat in handcuffs behind a security screen that the officer thought was locked. 516 F.3d at 953, 955. And in *Cagle*, we concluded that a jailer was unaware that a suicidal detainee might harm himself after the jailer confiscated the detainee's belt, shoelaces, and the contents of his pockets, asked inmates in adjacent cells with peepholes to watch the detainee, and observed him on a monitor every 15 minutes. 334 F.3d at 984, 989–90. In contrast to the officers in those cases, Gaddis and

11

Bauman did nothing. The deputies ignored Escano-Reyes and the likelihood that he would attempt to harm himself.

### IV. CONCLUSION

We **AFFIRM** the denial of summary judgment to Deputies Gaddis and Bauman.