[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12370

Non-Argument Calendar

_____

DONALD E. TURNER, JR.,
as personal representative of the estate of
Logan M. Turner deceased,

                                        Plaintiff-Appellee,

*versus*

PHILLIPS,
LT in his individual capacity as Bay County
Sheriff's Correctional Officer,
JOSEPH J. MASTRO,
in his individual capacity as Bay County Sheriff's
Correctional Officer,

2                    Opinion of the Court                    21-12370

Defendants-Appellants,

SEAN LEE BURKETT,
in his individual capacity as Bay County Sheriff's
Correction Officer, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:19-cv-00140-TKW-MJF

_____

Before JILL PRYOR, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

Logan Turner, when taken to jail, said, "I will kill myself if I have to be locked up."  And several weeks later he did—hanging himself with a bedsheet from his cell's top bunk

Only hours before, Turner had tied his pants to the top of a cell door, creating what one officer identified as "a noose."  That officer—and another who witnessed the same action—nonetheless stood by their decision to place him in a cell where he had access to another pair of pants, as well as the bedding he used to hang

himself.    The district court denied those two officers qualified immunity, explaining that they had done "essentially nothing to prevent" Turner's suicide, even after witnessing a possible suicide attempt.  After careful review, we affirm.

## I.

In April 2018, Turner was arrested for driving without a license, giving false identification, and possessing methamphetamine and related drug paraphernalia.  He was then taken to the Bay County Jail.  En route to the jail and upon arrival, Turner said that he would kill himself if he were incarcerated.  Jail officials placed him in the suicide-precaution dorm.

On May 1, 2018, Turner was released into the general prison population and spent a few weeks there without incident.  But on May 18, 2018, around 2:00 p.m., Turner asked Officer Marcus Roberts for a chance to speak with the jail's Chief about a medical issue.  Roberts initially denied the request, but when Turner asked again an hour later, Roberts brought Turner to the jail's medical staff.  The medical staff then referred Turner to the mental-health division.  There, Turner first spoke with a nurse; he denied being suicidal, but was otherwise "crying so inconsolably" that the nurse could not understand him.  So she referred Turner to the jail's mental-health coordinator who, after briefly speaking with him, decided to send Turner back to the general population.

He remained there for less than an hour.  When Roberts brought the general-population inmates their dinner, he saw

Turner slumped over by the phones, unresponsive. Roberts roused him, restrained him, and placed him in a holding area so that Roberts could speak to his supervisor, Lieutenant Kenneth Phillips. Phillips told Roberts to bring Turner to the jail's behavioral-observation unit.

When Turner arrived, Roberts placed him in the unit's shower room and left him there. Videotapes reflect that Turner then took off his shirt, sat hunched over on a bench, and buried his head in his hands. As he sat alone, he became more visibly distressed: he crouched on the floor, and then folded over and began moaning. Although Turner briefly sat up, he soon began rocking and again curled over. Eventually he stood up and, for about ten minutes, kicked the door and screamed, among other things, "Take me to the hospital now," "You're killing me," and "You're f***ing with my head."

No one answered. Turner, still screaming, then picked up a pair of pants on the floor and tied one of its legs to the top of the shower door. He appeared to begin tying a loop with another leg when an inmate supervising the unit, James Letson, noticed, walked over to him, and—as Letson tells it—talked him out of killing himself.

Meanwhile, the officer monitoring the unit through a central control room, Joseph Mastro, was also alarmed. He told Phillips that Turner "may be making a noose," and asked Phillips to check on him. Phillips reached the cell seconds after Letson— and approached closely enough for Letson to assume that Phillips

had overheard his and Turner's conversation. Letson then left for the control room, and told Mastro that he had just "diverted" a "big incident."

But as Mastro tells it, when Phillips returned to the same control room, he told a different story. Phillips seemed unconcerned, and suggested that Turner was "just trying to get attention." So he told Mastro that Turner should remain in the behavioral unit. That decision meant that Turner would be placed in a cell subject to some observation through intermittent rounds of the unit and through video surveillance over a live feed from the cell into the control room. But his cell would be just one of over 100 cells that the officer in the control room would monitor. And in that cell, Turner could keep the pants he was wearing, and would have access to a mattress, some tissue, a blanket, and two sheets.

Turner was soon moved into one of those cells, and around 6:00 p.m., both Mastro and Phillips left. They were replaced by Officers Freddie Furman and Tyshawn Potter. Shortly after the night shift began, another supervising inmate told Furman that Turner had said he "was going to harm himself." Within the hour, Furman reported Turner's statement to Mastro over the phone. Mastro told Furman not to worry: Phillips had "dealt with the situation," and Turner should "stay where he was at."

Furman nonetheless told Potter to monitor Turner more frequently over the live video. But that was not enough. Shortly before 9:00 p.m., while Furman was rounding the unit, he looked

6                    Opinion of the Court                  21-12370

into Turner's cell and saw him hanging from a bedsheet tied to the top bunk's metal frame.  A nurse accompanying Furman managed to restore Turner's pulse—but she was too late to save him.  Two days later, he was pronounced dead.

Turner's brother sued Phillips and Mastro (among others), bringing a claim under 42 U.S.C. § 1983 for an alleged deprivation of Turner's due-process rights and a state wrongful-death claim. Phillips and Mastro moved for summary judgment.  They argued that they had not violated any of Turner's constitutional rights and that, in any event, they were entitled to qualified and state-law immunity.  The district court disagreed and denied their motion. This appeal followed.

## II.

We review de novo a district court's denial of immunity. *Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291, 1296 (11th Cir. 2021).  Where, as here, that denial occurred on a summary-judgment motion, we view the evidence "in the light most favorable to the nonmoving party," and affirm "unless there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Patel v. City of Madison*, 959 F.3d 1330, 1336 (11th Cir. 2020) (internal quotation marks omitted). A genuine dispute of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III.

### A.

The officers primarily challenge the district court's denial of qualified immunity, which protects a government official sued for damages resulting from an alleged constitutional violation. *See Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir. 2021). Once an officer asserts qualified immunity, a plaintiff usually can overcome that assertion only by showing that (1) "the defendant violated a constitutional right," and (2) "the violated right was 'clearly established.'" *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).

The relevant right here is the Fourteenth Amendment's prohibition on depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This Court has interpreted that provision to confer upon pretrial detainees "a right to be protected from self-inflicted injuries, including suicide." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1115 (11th Cir. 2005). An officer violates that right when he exhibits "deliberate indifference" to a detainee's suicide—that is, when he knows there is a "strong likelihood" that a detainee will harm himself yet disregards that risk through conduct that is "more than mere negligence." *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008).

The officers first suggest that, when they interacted with Turner, a strong likelihood that he would kill himself *indisputably* did not exist. But surely a reasonable jury could disagree—and

could conclude, contrary to the officers' assertion, that they were aware of that risk. Mastro heard Turner screaming that the jail was "killing" him and, only minutes later, watched him tie what even Mastro identified as a "noose." Mastro was concerned enough to direct Phillips to speak with Turner. As Phillips approached Turner, he came close enough to the shower that a jury could conclude that he heard Letson's conversation with Turner—a conversation in which Letson says he persuaded Turner not to kill himself. Letson then left and told Mastro that he had just "diverted" a "big incident."

Those circumstances, construed in Turner's favor, support a conclusion that the officers knew that Turner had attempted suicide when he tied his pants to the shower door. And when prison officials "directly responsible for inmate care" know that "an inmate has attempted, or even threatened, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason v. Kemp*, 891 F.2d 829, 835–36 (11th Cir. 1990). Here, the officers had a clear step to protect a suicidal detainee: they could place him in the suicide-precaution dorm, where he could have been monitored more thoroughly and isolated from dangerous objects. Indeed, the officers seemingly concede that, if they were aware of any suicide risk, moving Turner would have been the proper course of action. But the officers chose not to take that action, keeping Turner in the behavioral unit with items he could use to harm himself. *See Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1270 (11th Cir.

2005).  And Mastro stood by that decision even after he was told that Turner had said that he planned to kill himself.

In sum, the officers here wholly failed to address what could be construed as a suicide attempt, and even advised another officer to similarly refrain from acting on a possible suicide threat.  A genuine issue thus exists as to whether they were deliberately indifferent to a known suicide risk—and so as to whether they violated Turner's due-process rights.  *See id.*

But a constitutional deprivation is not enough to sustain a 42 U.S.C. § 1983 claim against an individual officer.  The right infringed must be "clearly established," such that all but the "plainly incompetent" officer would know that his actions violated the law.  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

A right may be clearly established through "a materially similar case decided at the time of the relevant conduct by the Supreme Court, the Eleventh Circuit, or the relevant state supreme court."  *Patel v. Lanier County Georgia*, 969 F.3d 1173, 1186 (11th Cir. 2020).  And here, as in this Court's case *Snow ex rel. Snow v. City of Citronelle*, the officers essentially "did nothing" to prevent a suicide that, arguably, was likely to occur.  420 F.3d at 1270.  Both the officer in *Snow* and the officers here simply left suicidal detainees in a cell with items that they could—and did— use to harm themselves.  *Id.*

The officers contend that *Snow* is too different from this case to clearly establish Turner's rights, because the inmate in

*Snow*, unlike Turner, was not monitored through regular rounds of the unit and a live video feed. But a precedent "need not be directly on point" to clearly establish a right; it simply "must have placed the statutory or constitutional question beyond debate." *J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018). *Snow* did not focus on the jail's precise features; rather, it emphasized that an officer's "complete failure to take any action" in the face of a known suicide risk violates a detainee's due-process rights. *Snow*, 420 F.3d at 1270. And the officers effectively took no action here. A jury could reasonably conclude that the officers were aware that Turner had a high risk of suicide and nonetheless kept him in a dorm where he would have dangerous items at his fingertips, despite the availability of a dorm specially designed to protect suicidal inmates. The officers here thus were not entitled to qualified immunity.

## B.

Phillips and Mastro raise one more challenge to the § 1983 claim, arguing that, because other officers monitored Turner in the few hours between the end of their shift and his suicide, no reasonable jury would conclude that they caused the harm that Turner suffered. Yet their decision to keep Turner in the behavioral unit gave him access to the sheet he used to hang himself just hours later. In addition, after the shift ended, Mastro told the new officer on duty that Turner should remain in the unit—even though Mastro had been told that Turner said that he planned to kill himself. That is evidence enough to create a

substantial issue of causation.  The district court therefore properly denied summary judgment on the § 1983 claim.

## C.

The officers also argue that Florida law gives them immunity from the wrongful-death claim.  Florida protects its officers from suit unless they "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  Fla. Stat. § 768.28(9)(a).  This statute's language might differ from the relevant federal standards, but it offers no further protection.  The federal standard for deliberate indifference amounts to recklessness, and so does the standard of "wanton and willful" conduct under Florida law.  *See Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994); *Williams v. City of Minneola*, 619 So. 2d 983, 986 (Fla. Ct. App. 1993).  Because there remains a genuine issue as to whether the officers were deliberately indifferent, then, there is also a genuine issue as to whether their actions were "wanton and willful."  Thus, their argument for state-law immunity fails.

★    ★    ★

The stage of litigation is crucial here.  Our role is limited: we cannot weigh the evidence; rather, we can only conclude whether it is so one-sided that the result of any trial is inevitable.  That is not the case here.  A jury might conclude that the officers made an honest—though fatal—mistake, or, alternatively, that they knew Turner was suicidal yet did nothing to prevent him from

killing himself.  Which conclusion the evidence better supports is thus a question for a jury, not this Court.  For now, we can only say that, under our precedent and a view of the evidence in Turner's favor, the officers are not entitled to judgment in their favor as a matter of law.  We therefore **AFFIRM** the district court's denial of summary judgment.