[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-13282

_____

D.C. Docket No. 5:10-cv-00568-WTH-PRL

VIVIAN JACKSON,
Personal Representative of the Estate of Darius Johnell James

Plaintiff-Appellee,

versus

PRESTON WEST, in his individual capacity,
RONALD BURNETTE, in his individual capacity,
STANLEY ROSS, in his individual capacity,
MARK MCEWAN, in his individual capacity,
MICHAEL FORTE, in his individual capacity,
JOSEPH LAVERTUE, in his individual capacity,
DONALD THORSBERG, in his individual capacity,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 3, 2015)

Before MARTIN and ROSENBAUM, Circuit Judges, and COOGLER,[*] District Judge.

MARTIN, Circuit Judge:

This case is about the tragic death, by suicide, of Darius Johnell James while he was in the custody of the Marion County Jail in Ocala, Florida.  On October 14, 2007, Mr. James took his own life by hanging himself with a bed sheet.  He was 22 years old at the time.  Vivian Jackson, Mr. James's mother and the Personal Representative of his Estate, filed a 42 U.S.C. § 1983 complaint against the county sheriff in his official capacity and against ten corrections officers in their individual capacities.  She alleged that these officers violated the Due Process Clause of the United States Constitution by failing to prevent Mr. James's death. The District Court ruled that qualified immunity barred suit against three officers, but not against the remaining seven: Captains Burnett[1] and Forte, Corporals McEwan and West, Sergeant Ross, and Officers Lavertue and Thorsberg.[2]  These officers appeal that order here.  They argue that because they did not have subjective knowledge of a serious risk of suicide, they were not deliberately indifferent to Mr. James's taking of his own life.  Our precedent requires us to

---

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

[1] Although our docket refers to Captain Burnett's last name as "Burnette," the defendants' brief refers to his last name as "Burnett," as do we.

[2] The claim against the sheriff is not before us.  It has been stayed by the District Court pending the outcome of this appeal.

2

agree, and we reverse.

## I.

The details of Mr. James's stay in prison are lengthy but important. The defendants are entitled to qualified immunity unless they had subjective knowledge of a serious risk that Mr. James would attempt suicide.

Mr. James was arrested on June 30, 2007, for an alleged robbery and home invasion. When first admitted that day, Mr. James was given a suicide prevention screening by a licensed nurse employed by Prison Health Services—the independent contractor that provided medical and mental health care to inmates and pretrial detainees. That nurse noted that Mr. James said "he [was] ready to die," "talk[ed] about seeing evil," and "appear[ed] overly anxious, afraid or angry." He was assigned to "SP," the prison's suicide prevention section. The next day, July 1, a Prison Health Services counselor conducted a psychological exam. The counselor noted that Mr. James appeared "agitated" and "defensive" and thought "everyone wanted to kill him," but also noted that he denied any suicidal ideation at that time. Based on that assessment, the counselor directed that Mr. James be released from the suicide prevention section to the Charlie Foxtrot section, which housed inmates designated as "special needs."

At around 9 p.m. on July 1, Mr. James and three defendants, Officers Lavertue and Thorsberg, and Captain Burnett, were involved in an incident in the

3

Charlie Foxtrot section.  Another inmate named Evans began to shout verbal threats at an officer, and Mr. James "verbally agree[d] with him, nodd[ed] [his] head[] and pound[ed] [his] fist[] into his palm[], saying, 'yeah, yeah, let's get him.'"  After Evans was restrained and removed from the Charlie Foxtrot section, Officer Thorsberg reported the following:

> Sgt. Hampton [a non-party] then counseled with inmate James in the presence of writer [Officer Thorsberg] and Officer Lavertue.  It was obvious to all officers that inmate James has certain anti-social, aggressive behavioral problems that may need to be addressed by the medical/psyc[h] department.  Sgt. Hampton talked to medical and it was determined that inmate James would be placed on AC[3] confinement status pending a psychological exam.  No [disciplinary report was] written due to his diminished mental capacity.  Sgt. Hampton and Officer Lavertue escorted him to Alpha pod without further incident.  Inmate James took his property with him.

Although he was not present for the incident, Captain Burnett, as watch commander, was required to read this narrative at the end of his shift.

The next day, July 2, Mr. James met with a Prison Health Services counselor.  He told the counselor that he was "god's chosen one," and that he had no mental health problems until he took cold medicine.  There is no mention of suicidal ideation that day.  Mr. James remained in the Alpha pod for three days.  In the evening of July 4, Mr. James began yelling and flooded his cell with water.  After he ignored orders to submit to handcuffing from five officers, an officer used

---

[3] "AC" stands for the Alpha pod, section C, which houses "male inmates with disciplinary actions against them."

a Taser three times to subdue him.  Throughout the altercation, Mr. James tried to "hit, kick and bite the officers involved," "was combative," and was "out of control."  Eventually, he was secured to a hospital bed in Alpha pod, E section, checked, released, and rehoused in Alpha pod, B section without any further incident.  The only defendant involved in this incident was Captain Burnett, who again was required to read the report.

On July 6, while still in Alpha pod, B section, Mr. James said to Officer Mosher—not a defendant[4]—that he "wanted to go suicide."  When asked if "he intended to hurt himself, . . . he replied 'I'm for real, I'm super suicidal.  I want to cut my throat.'"  Mr. James was immediately "handcuffed, escorted to medical and evaluated . . . and placed on suicidal precaution."  The only defendant involved in this incident was Captain Forte, who was the commanding officer that day and was required to read the report.  Mr. James remained in the suicide prevention section until July 10.  His evaluation that day says that he denied suicidal ideation and that he was "doing much better."  He was released by medical personnel from the suicide prevention section back to the Charlie Foxtrot section.

No other major incidents occurred during the month of July, though Mr. James was transferred to the Alpha pod again on July 17, and was returned to Charlie Foxtrot on July 24.  On August 3, 5, 7, 9, and 31, Mr. James submitted

---

[4] Officer Mosher was among the original defendants, but the District Court granted his motion for summary judgment, and that holding has not been challenged on appeal.

inmate medical request forms saying that he was having difficulty sleeping and felt stressed.  It appears that those requests were, as the District Court put it, "largely ignored."

On August 6, another incident occurred.  In the Charlie Foxtrot section, Officer Lavertue and a non-party officer found another inmate (Anthony McBride) "on top of [Mr. James] hitting him with closed fists."  Mr. James was seen by a nurse, who "cleared him to remain in the Foxtrot Section."  Inmates who witnessed the incident told the officers that "inmate McBride went upstairs to inmate James['s] cell 248 went into his cell and closed the door and started to hit inmate James."  Mr. James remained in the Charlie Foxtrot section, but was moved to cell 154, on the lower level.

On August 12, Mr. James requested to be moved from the "special needs" section into the general population.  On August 14, a doctor approved this request after noting that he denied any suicidal/homicidal ideation.  Mr. James was moved to the Charlie Bravo section.  On August 15, however, Mr. James "report[ed] he c[ouldn't] handle [general population]."  Although he reported to medical personnel "no SI/HI" (suicidal/homicidal ideation), he "fe[lt] very anxious and like people [were] out to harm him."  He was moved back to Charlie Foxtrot that day.  Officer Lavertue placed Mr. James in cell 152 on the lower level.

On September 4, Mr. James was involved in an altercation with another

inmate, Alvin Rivers. Witnesses said that "inmate Rivers and inmate James had a verbal disagreement over their dinner trays and inmate Rivers struck inmate James on the forehead twice. The witnesses also agreed that inmate James only tried to defend himself and clearly was not the aggresser [sic]." On September 21, Mr. James was involved in a verbal dispute with another inmate, though officers were able to stop it before it turned physical. Mr. James was transferred to the Alpha pod for disciplinary confinement, and remained there until October 2, when he was returned to Charlie Foxtrot. None of the defendants were involved in either of these September incidents.

On October 14, Mr. James committed suicide in cell 254 on the upper level of the Charlie Foxtrot section. The last officer to see Mr. James alive was Officer West—a defendant. He says: "I did observe the decedent on or about 0645 hours on October 14, 2007, during breakfast and he received his breakfast tray. At approximately 07:20, I conducted a headcount and the decedent was alive, awake and accounted for." At around 10:09 a.m., an inmate notified four officers— Captain Burnett, Sergeant Ross, and Officers McEwan and West (all defendants)— that another inmate was hanging himself. According to Sergeant Ross's description, the following occurred:

> Inmate Seiler advised us that inmate Darrius James was hanging himself. Officer West and myself entered cell 254 where inmate James is currently housed and discovered inmate James hanging from the bedpost with an inmate bedsheet. Captain Burnett and Sergeant

7

Ross were present in Charlie pod at this time and entered Foxtrot Section with us. At approximately 1010 hours Captain Burnett called a Signal 34 Code Red on the radio. Officer West and I lifted inmate James off the ground and Captain Burnett removed the bedsheet from the bedpost. Once inmate James was laying on the ground Officer West removed the bedsheet from around inmate James' neck. I checked inmate James for a pulse with negative results and then I began chest compressions.

The incident report states that the officers continued to give medical care until medical services personnel arrived at approximately 10:25 a.m. At approximately 10:45 a.m., Mr. James was transported to a hospital. At approximately 11:11 a.m., he was pronounced dead.

Ms. Jackson filed a § 1983 complaint against the county sheriff in his official capacity and against ten corrections officers in their individual capacities. Ms. Jackson then agreed to the grant of motions for summary judgment of three of the officers—Officers Mosher, Savarese, and Hampton. The District Court summarily denied the motions for summary judgment—except for those three officers—in a one-page order. The remaining seven officers appealed, and this Court vacated the District Court's order and remanded the case for the District Court "to enter a reasoned order that addresses whether these seven officers are entitled to a summary judgment," Jackson v. Sheriff, Marion Cnty., Fla., 515 F. App'x 876, 877 (11th Cir. 2013) (per curiam).

On remand, the District Court entered a detailed order explaining why it denied summary judgment for the remaining seven officers. That order is now

8

before us on appeal.

## II.

We review de novo the District Court's denial of summary judgment. Cagle v. Sutherland, 334 F.3d 980, 985 (11th Cir. 2003) (per curiam). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." Scott v. Harris, 550 U.S. 372, 378, 127 S. Ct. 1769, 1774 (2007) (alteration adopted) (quotations omitted). In this case, that is Ms. Jackson, so we view the record in the light most favorable to her.

"Government officials performing discretionary functions are entitled to qualified immunity 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Hartley v. Parnell, 193 F.3d 1263, 1268 (11th Cir. 1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)).[5] We focus on two questions: "first, . . . whether there is 'an underlying constitutional violation,' [and] second, . . . whether the law the public official is alleged to have violated was 'clearly established' at the time of incidents giving rise to the suit."

---

[5] All parties agree that the defendants were performing discretionary functions.

Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000) (citations omitted).

> A § 1983 claim is predicated on an alleged violation of an underlying constitutional right.  In the case of a pre-trial detainee like [Mr. James], the Eighth Amendment prohibitions against cruel and unusual punishment do not apply.  Nevertheless, in regard to providing pretrial detainees with such basic necessities as medical care, the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons.  Thus, pretrial detainees like [Mr. James] plainly have a Fourteenth Amendment due process right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide.

Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1115 (11th Cir. 2005) (alterations adopted) (quotation marks and citations omitted).

"In a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under either the eighth or fourteenth amendment, the plaintiff must show that the jail official displayed deliberate indifference to the prisoner's taking of his own life."  Edwards v. Gilbert, 867 F.2d 1271, 1274–75 (11th Cir. 1989) (emphasis added) (quotation omitted).  "In addition, once the defense of qualified immunity is raised, the plaintiff must persuade the court that the law was clearly established that the defendant's conduct in the circumstances amounted to deliberate indifference."  Id. at 1275 (quotation omitted).

> [D]eliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.  Therefore, summary judgment must be granted for the defendant official unless the

10

> plaintiff presents evidence of the official's subjective knowledge, as follows: since a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness.

McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (alterations adopted) (quotation marks and citations omitted). "Absent knowledge of a detainee's suicidal tendencies, . . . failure to prevent suicide has never been held to constitute deliberate indifference." Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir. 1990) (per curiam). "Each individual Defendant must be judged separately and on the basis of what that person knows." Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008).

This rule is exemplified in Snow ex rel. Snow v. City of Citronelle, Alabama, 420 F.3d 1262 (11th Cir. 2005). In that prison suicide case, this Court affirmed the District Court's grant of qualified immunity for five defendants, but reversed for one. We held that, for five of the defendants, the plaintiff "ha[d] not presented any evidence that [the defendants] had subjective knowledge of a strong likelihood that [the decedent] would attempt to commit suicide." Id. at 1269. Although the decedent told a doctor that she had attempted suicide four times in the past, "there [was] no evidence that these defendants knew about that information." Id. At best, one of those five officers heard the decedent tell a doctor that she had attempted suicide in the past, but that officer "did not know

11

when the attempt had taken place." Id. "[T]his knowledge, without more, [was] not sufficient to put [the officer] on notice of a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." Id. (quotation omitted).

By contrast, for a sixth officer, this Court reversed the District Court's finding of qualified immunity. The record revealed the following:

> First, [the officer] testified in deposition that he telephoned [another] jail, and a jailor told him that, sometime in the last month, [the decedent] had tried to cut her wrist while in custody there and had given them a lot of trouble. Second, the [the decedent's family] testified that [the officer] told them [the decedent] was suicidal. Third, it is undisputed that [the officer] did not communicate any information regarding his belief that [the decedent] was a strong suicide risk to anyone else at the jail. Finally, [the officer] stated that he did not take the actions he would have taken had he regarded [the decedent] as a suicide risk.

Id. at 1270. In sum, in the face of information that should have alerted him to a risk that the decedent would attempt suicide, this officer "did nothing." Id. On this evidence, we held that "a jury could find that [the officer] subjectively believed that there was a strong risk that [the decedent] would attempt suicide and deliberately did not take any action to prevent her suicide." Id.

### III.

Because we must consider each officer individually, we analyze what each officer knew about Mr. James's risk for suicide at the time of his death. We conclude that none of the seven officers appealing the District Court's order had subjective knowledge of a strong risk that Mr. James would attempt suicide, and

12

that none of the seven officers were deliberately indifferent for qualified immunity purposes.  Summary judgment should have been granted to each of them.

### Officer Lavertue

Officer Lavertue first interacted with Mr. James during the July 1, 2007, incident in which Mr. James joined another inmate in verbally attempting to incite violence against officers.  Although the incident report mentioned "certain anti-social, aggressive behavioral problems that may need to be addressed by the medical/psyc department," it said nothing about any threat of suicide.  Next, Officer Lavertue interacted with Mr. James during the August 6, incident in which officers found another inmate on top of Mr. James punching him.  There was no suggestion of suicide risk.  Based on the assignment sheets, which are slightly incomplete and begin only on August 8, from September 4 until Mr. James's suicide on October 14, Officer Lavertue did not work in Charlie pod at all.  In his sworn interrogatory, he said that he "was never informed by the decedent or any other individual that the decedent was at risk of self[-]harm and/or suicide."

Based on the two incidents Officer Lavertue saw—neither involving any mention of suicide—we see no genuine issues of fact regarding whether Officer Lavertue had subjective knowledge of a strong risk of suicide.  "Anti-social, aggressive behavioral problems" do not rise to the level of a strong risk of suicide. Neither did Officer Lavartue have any recorded interaction with Mr. James from

13

September 4th until Mr. James's suicide forty days later. Thus, he could have had no warning of suicide risk during that time. Officer Lavartue's summary judgment motion should have been granted.

### Officer Thorsberg

Like Officer Lavertue, Officer Thorsberg was also present for the July 1 incident, which included no indication that Mr. James was suicidal. In his deposition, he stated that he wrote about Mr. James's "[a]nti-social, aggressive" behavior because "[Mr. James] was taking his fists and pounding it in his hand and addressing it towards [Thorsberg]." Officer Thorsberg is not mentioned in any other incident report. Also like Officer Lavertue, the assignment sheets reveal that Officer Thorsberg did not work in the Charlie pod from September 4th until Mr. James's suicide on October 14th. For the same reasons discussed as to Officer Lavertue, there is no genuine issue of fact regarding whether Officer Thorsberg had subjective knowledge of a strong risk of suicide. Officer Thorsberg's summary judgment motion should have been granted.

### Captain Forte

Captain Forte served as a watch commander. When serving in that role, he was the person in charge of the entire jail. He was watch commander on July 6, when Mr. James made one of his two explicit suicide threats. Though Captain Forte was not present for the incident, he "signed off on [the report], at the end of

14

shift, [saying] that [he] had read the report." However, as he noted in his deposition, "[o]nce [Mr. James] was placed on suicide precaution," Captain Forte would not "have personally followed up to see what happened to" him. Prison Health Services—the independent contractor that provided medical services—would decide when Mr. James should be released from the suicide prevention section and back into general population. The incident on July 6 was the only warning that Captain Forte had of any suicidal ideation. No one contests that all the officers involved in that incident followed proper protocol and immediately sent Mr. James to the suicide prevention section and scheduled him for mental health evaluation.

"[D]eliberate indifference requires that the defendant deliberately disregard a <u>strong likelihood</u> rather than a mere possibility that the self-infliction of harm will occur." <u>Cook</u>, 402 F.3d at 1115 (quotation and citation omitted). Captain Forte did not disregard a strong likelihood that Mr. James would commit suicide in October based on the July incident. All indications are that during the July incident, the responding officers did what they were required to do. That is, to ensure that Mr. James was immediately transferred to the suicide prevention section. Ms. Jackson has offered no legal precedent to suggest that following a transfer to the suicide prevention section, a watch commander should be liable for medical personnel's independent decision days later to release an inmate. Captain

15

Forte's summary judgment motion should have been granted.

## Corporal McEwan

Corporal McEwan worked in the Charlie pod for many days in August, September, and October, when Mr. James was mostly housed in the Charlie Foxtrot section. The only incident report mentioning Corporal McEwan is one from August 4, when he was notified by a jail trustee that Mr. James was in a fight. There is no mention of suicide in that report. Corporal McEwan was also present on October 14, and was one of the officers that responded to Mr. James's suicide. However, his testimony is that before the suicide, he never recalled Mr. James talking about wanting to kill himself or hurt himself, or asking for help. Ms. Jackson has offered no evidence that Corporal McEwan had any specific knowledge of Mr. James's suicide risk. Thus, there is no genuine dispute of fact as to whether Corporal McEwan had subjective knowledge of a strong risk of suicide, and his summary judgment motion should have been granted.

## Corporal West

Corporal West also worked in the Charlie pod for many days in August, September, and October. Like Corporal McEwan, the only incident report mentioning Corporal West is one following the minor fight on August 4. Also like Corporal McEwan, Corporal West responded to Mr. James's suicide. He is the last officer to have a recorded interaction with Mr. James before his suicide—during a

16

headcount about three hours earlier.  In his deposition, Corporal West noted that he remembered nothing in particular about Mr. James prior to his suicide.  Just like Corporal McEwan, there is no genuine dispute of fact about whether Corporal West had subjective knowledge of a strong risk of suicide.  Corporal West's summary judgment motion should have been granted.

### Sergeant Ross

Sergeant Ross was a supervising officer for the Charlie pod on many days in August, September, and October.  The only incident report mentioning Sergeant Ross is the suicide report on October 14.  It is undisputed that Sergeant Ross had no recorded contact with Mr. James before that day.  His summary judgment motion should have been granted.

### Captain Burnett

Like Captain Forte, Captain Burnett was a watch commander and was responsible for overseeing the entire jail when he was on duty.  The assignment sheets show that he was watch commander many days in August, September, and October.  He was also on duty on July 1, when Mr. James threatened officers.  And he was one of several responding officers to Alpha pod on July 4, when Mr. James flooded his cell.  Neither of those July reports contains any mention of suicide.

As with the officers above, neither the July 1 nor the July 4 incidents involved any suggestion of suicidal ideation, so we find no genuine dispute of fact

as to whether Captain Burnett had subjective knowledge of a strong risk of suicide. A report of "[a]nti-social, aggressive behavioral problems" does not rise to the level of a strong risk of suicide. Captain Burnett's summary judgment motion should have been granted.

IV.

Despite this dearth of actual evidence, the District Court and Ms. Jackson point to a number of pieces of information in the record as sufficient circumstantial evidence of the defendants' subjective knowledge of a serious risk of suicide. None is persuasive.

First, the District Court relied on a one-page declaration from another inmate in the Marion County Jail. Jean-Pierre Francis said the following:

> I personally knew Darius James. . . . I was in the rec yard when Darius James was found hanging in his cell. I have personal knowledge that the officers in that section of the jail were aware of threats Darius had made to kill himself but they just didn't care. I am aware that Darius had been telling the officers for 2-3 weeks prior to his death that he was going to hurt himself.

The District Court held that a jury could find that this declaration "discredit[ed] the testimony of the Defendants that they, individually, had no knowledge that James posed a threat of suicide."

We conclude that the record does not support the District Court's holding. Mr. Francis's declaration provides no information that any of the defendants in this case had knowledge of Mr. James's threats. His declaration is short, vague, and

18

names no officers.  On top of that, during the weeks before Mr. James's suicide, a number of non-defendant officers were assigned to the Charlie Foxtrot section, and any of them could have been the officers to whom Mr. Francis referred.  In short, this terse declaration is insufficient to show subjective knowledge by these defendants.  See Burnette, 533 F.3d at 1329 n.2, 1332 (holding, in a prison-suicide case, that another inmate's testimony that "[e]verybody told them that [the decedent] needed help" was insufficient to show deliberate indifference because "[w]ho exactly he meant by 'them' and when this notification occurred are unspecified").[6]

Second, the District Court said the defendants had subjective knowledge of a strong risk of suicide because, "while it is disputed, there is evidence that one of the places in the jail designated for the housing of suicidal inmates is the lower level of Charlie Foxtrot."  Even assuming—as we must at summary judgment— that some suicidal inmates were kept in the Charlie Foxtrot section, this fact alone does not mean that the defendants had subjective knowledge that Mr. James was suicidal.  The District Court found that "for the last few weeks of his life, James was detained in a cell that was so remote, that officers could only observe him by

---

[6] We reject the defendants' argument that Mr. Francis's declaration is "refuted" by their testimony that they had no knowledge of any suicidal tendencies.  One cannot "refute" a witness's statements using another witness's statements at summary judgment; such a swearing contest is one for the jury to resolve.  We do not conclude that Mr. Francis's claims are refuted.  We conclude that they are simply too cursory and too vague to create a genuine issue of fact about any defendant's personal, subjective knowledge of a suicide risk.

19

physically walking in front of the cell door." But we cannot sanction a finding that no inmates in Charlie Foxtrot could have reasonably been placed in that remote cell. To survive summary judgment as to each defendant, Ms. Jackson must point to a genuine issue of fact as to whether that defendant had subjective knowledge that Mr. James specifically should not have been placed in a remote cell. She has not done so.

Third, the District Court suggested that the defendants' knowledge of Mr. James's suicide risk can be inferred from the fact that they frequently "moved James in and out of the Charlie Foxtrot section on several occasions, and from the upper level to the lower level of that unit at other times." This, Ms. Jackson argues, demonstrates that the defendants knew about his suicidal ideation since they sometimes placed him in cells that were more visible to the officers' watch booth. However, Mr. James's "Housing Moves" log reflects that he was usually moved because he was being transferred to another pod, or for a "bed change." Without more, the mere fact that Mr. James was moved around between cells cannot show a particular defendant had subjective knowledge of a serious risk that he would commit suicide. And as the defendants point out, there is no evidence in the record that "there would have been any 'advantage' to an inmate being placed closer to C Pod's rovers office, as there is no evidence about the visibility of any other cells' interiors."

Finally, the District Court observed that "the Parties have submitted competing expert reports addressing, among other things, whether the Individual Defendants were deliberately indifferent to a known risk that James would commit suicide." Specifically, the District Court referenced the expert report of Ronald D. McAndrew. That expert report says, in relevant part:

It is further my professional opinion:

- That Mr. James repeatedly advised both security and mental health staff of the Marion County Jail that he was suicidal, even that he was "super suicidal."
- That appropriate measures were not taken to protect this mental health patient from killing himself by security or mental health staff.
- That Mr. James was placed into a security cell alone and literally provided with suicide tools so that he could carry out his suicidal threat. . . .
- That a self-described "super suicidal" inmate was not observed by security staff for almost three full hours prior to the discovery of his death.
- That a self-described "super suicidal" inmate was placed into open population gives way to the strongest opinion that there was deliberate indifference across the board at the Marion County Jail in terms of safety.

This report suffers from the same defects as the rest of the evidence the District Court cited. Namely, it says nothing about what each particular defendant in this case subjectively knew. The lack of specificity is highlighted by the report's suggestion of "deliberate indifference across the board." (Emphasis added.) Beyond that, the report implies that the true violators in this case are the "mental health staff" who allowed Mr. James to leave the suicide prevention section and

21

join the general population after he was initially put on suicide watch. Finally, the expert report relies solely on Mr. James's statement that he was "super suicidal," which—as discussed—happened more than three months before his suicide, and was unknown to most of the defendants.

Ms. Jackson has failed to offer any evidence that the defendants had the subjective knowledge required to show that they were deliberately indifferent to a strong risk that Mr. James would commit suicide. Absent subjective knowledge, there is no genuine issue of fact about whether any of the officers showed deliberate indifference. Summary judgment should have been granted.

V.

Finally, we address the District Court's additional finding "that material issues of fact remain in dispute as to whether the Individual Defendants responded in a timely manner to James' suicide." In particular, the Court noted testimony from Mr. Summers—the inmate who first told officers about Mr. James's suicide attempt on October 14—which suggests that, contrary to the official report, Mr. Summers untied Mr. James and that it took over ten minutes for officers to arrive at the cell.

Ms. Jackson has forfeited this argument by not raising it in her complaint

before the District Court.[7]  Acting with deliberate indifference to a serious medical need is a separate claim from acting with deliberate indifference to a known risk of suicide.  Although both involve a deliberate-indifference standard, serious-medical-need claims have to do with the "length of delay in providing medical attention depend[ing] on the nature of the medical need and the reason for the delay."  Harris v. Coweta Cnty., 21 F.3d 388, 393–94 (11th Cir. 1994).  Even reading the complaint liberally, and looking only for facts sufficient to state a claim, Ms. Jackson never brought up the amount of time that passed between the alert that Mr. James was committing suicide and the moment officers arrived and began to administer medical care.  We decline to address this separate cause of action not raised by Ms. Jackson before the District Court.  See Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 360 (11th Cir. 1984) ("[A]n appellate court generally will not consider a legal issue or theory unless it was presented to the trial court.").

## VI.

This case is troubling.  The Marion County Jail tragically failed to keep Mr. James safe while he was incarcerated.  Under our precedent, however, an officer is

---

[7] Although Ms. Jackson does, briefly, touch on this argument in her opposition to the officers' motion for summary judgment, she does not do so in any meaningful way.  See Flanigan's Enters. Inc. v. Fulton Cnty., Ga., 242 F.3d 976, 978 n.16 (11th Cir. 2001) (noting that a party waives an issue where, although mentioning it in passing, the party fails "to elaborate or provide any citation of authority in support of the . . . allegation").

23

liable under § 1983 for the suicide of an inmate only if he had subjective knowledge of a serious risk that the inmate would commit suicide and he disregarded that known risk.  Because we find no genuine factual dispute about the subjective knowledge of these seven defendants, we cannot sustain the District Court's ruling.  We reverse with the instruction that the District Court grant the defendants' motions for summary judgment.

**REVERSED AND REMANDED.**