[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-14703

_____

D.C. Docket No. 1:12-cv-00174-CG-N

BRENDA SALTER,
as administratrix for the Estate of William Scott Salter,

Plaintiff - Appellee,

versus

WILBUR MITCHELL,
SHIRLEY TRENT,
ALISHA PATE,

Defendants - Appellants

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(October 5, 2017)

Before  WILSON and NEWSOM,  Circuit  Judges  and  MORENO,<sup>*</sup> District Judge.

_____

*Honorable Federico A. Moreno, United States District Judge for the Southern District
of Florida, sitting by designation.

MORENO, District Judge:

In this interlocutory appeal, Defendants Jail Administrator Wilbur Mitchell, Captain Shirley Trent, and Corrections Officer Alisha Brown[1] appeal the district court's denial of their motion for summary judgment.  Defendants contend they are entitled to qualified immunity in this 42 U.S.C. § 1983 action brought by the widow of William Scott Salter, who committed suicide while in jail.  We find that the Defendants were not deliberately indifferent to the inmate's constitutional rights, and thus Defendants are entitled to qualified immunity.[2]

A determination of fault in cases of suicide is a painful task usually self-imposed by the family and friends of the individual who succeeds in his attempt to end his life.  The Eighth Amendment's prohibition against cruel and unusual punishment applies that same obligation to those holding prisoners in custody.  But the law also tempers that obligation not to violate a prisoner's rights by granting qualified immunity to those who may not have personal knowledge of a suicide risk, and even to those with knowledge who were not deliberately indifferent to those risks.  Administrator Mitchell, Captain Trent, and Officer Brown were not deliberately indifferent as they based their actions on an experienced physician's

---

[1] After this suit was filed, Alisha Brown married and changed her last name to Pate.

[2] The Appellants do not appeal the district court's decision that they are not entitled to state-agent immunity under Alabama law.  Thus, the argument is abandoned.  See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004).

2

recommendation to move Mr. Salter from "suicide watch" to the "health watch" unit, where, unfortunately, he killed himself.

## I. Factual Background

This case stems from the suicide death of an inmate, William Scott Salter, at the Conecuh County Detention Facility on March 9, 2010.  Salter had a history of depression and had been an inmate at this jail in the past.  About seven months before his death, Salter was arrested and incarcerated from August 31 until September 10, 2009, when the probate court committed him to Searcy Mental Hospital.

A few months later, on February 8, 2010, Salter placed an emergency call to the Conecuh County Sheriff reporting a stabbing and burglary.  The Sheriff's investigator, Sharon Caraway, determined the stabbing was self-inflicted, noting Salter's history of suicide threats.

On February 25, 2010, Sheriff Dispatcher Jennifer Wright received a 911 emergency call from Salter, who was threatening suicide.  Shortly thereafter, Salter met his therapist, Kevin Bryant, at Southwest Health Center.  After their appointment, Bryant sent Salter home because he was not having suicidal thoughts.

Four days later, on March 1, 2010, Evergreen Police Detective Sean Klaetsch arrested Salter on a felony warrant for unlawful breaking and entering of a vehicle and stealing a Remington 12-gauge shotgun.  Salter was transported to

the Conecuh County Detention Facility and during processing, Salter reported to

the booking officer that he had "mental problems," suffered from depression, and

that he took medications for pain and mental issues. Salter also said he was

sometimes suicidal and that he had twice tried to kill himself. Salter's booking

sheet lacks information regarding the timing of his past suicide attempts,

specifically that one had taken place as recently as February 25, 2010.

The booking officer placed Salter on a suicide watch.[3] At the Conecuh

County Jail, corrections officers had authority to place inmates on suicide watch,

but only the jail doctor, Fred West, M.D., had sole authority to remove an inmate

from suicide watch.[4] Detective Klaetsch told the jail nurse, Monica Johnson, that

Salter was suicidal. Ms. Johnson relayed Salter's condition to Captain Trent, the

highest ranking officer at the jail at the time Salter was booked. Ms. Johnson

testified generally that "everyone" at the jail knew that Salter had attempted

suicide recently. Captain Trent also testified that she was aware Salter had "some

history" of attempting suicide. Administrator Mitchell testified that he was

unaware of the February 25th incident, but he knew of Salter's mental health issues

---

[3] Although Plaintiff testified that her husband was placed on suicide watch, she argues on appeal that the jail did not put him on suicide watch when he was booked. To support this, she cites to a memo that Administrator Mitchell wrote after Salter's death indicating that Salter was put in an isolation cell, but had not been on suicide watch. It is unequivocal that at the time of Salter's death, he was not on suicide watch. Even if there was a dispute as to whether Salter was initially on suicide watch, that would be immaterial as Salter did not injure himself until after he was put on health watch. The parties do not dispute that Dr. West put Salter on health watch.

[4] Dr. West died before his deposition could be taken in this case.

from the booking records.

Consistent with suicide watch protocol, Salter was assigned to an isolation cell at the front of the jail in the booking area. Inmates on suicide watch do not receive linens, bed sheets, or clothing other than boxer shorts. Corrections staff must visually check inmates on suicide watch every 15 minutes.

After Salter was processed, Captain Trent noticed Salter was upset because jail staff refused to give him Lortab and Xanax, medications not routinely given to inmates. Ms. Johnson visited with Salter for 30 minutes and asked if he had any thoughts about hurting himself, and he responded that he did not. She advised Salter that he would see Dr. West on his scheduled day, March 3, 2010.

On March 2, 2010, Salter had "outbursts" during which he demanded his Lortab and Xanax. Salter had been moved to an isolation cell next to Ms. Johnson's office, which could be monitored from the booking area. Ms. Johnson responded to an incident where Salter fell to the floor and complained that he was unable to use his left side. After assessing Salter, Ms. Johnson believed he was likely faking the incident in an attempt to get his medications. At that time, she noticed Salter had a blanket in his cell and she removed it consistent with suicide watch protocols. Later that day, Salter refused dinner and Officer Brown placed Salter in a restraint chair for banging his head against the door. Officer Brown relayed the incident to both Ms. Johnson and Administrator Mitchell.

5

The next day, on March 3, 2010, Dr. West examined Salter in Ms. Johnson's presence. In his medical notes, Dr. West, who already knew Salter, reported that he was "extremely depressed and agitated" due largely to his inability to work as a result of chronic back pain. Dr. West documented Salter's February 25, 2010[5] threatened suicide. In telling Dr. West about his February 25th threatened suicide, Salter reported that he had been unable to pull the trigger out of worry for his family. Dr. West also noted the earlier stabbing incident. On March 3, Salter told Dr. West that he was not currently suicidal.

After examining Salter, Dr. West decided to "treat him appropriately and keep him in isolation to watch." Dr. West resumed Salter's Lortab and Xanax to avoid withdrawal. He also prescribed Seroquel for bipolar depression and Nefazodon for depression. In his notes, Dr. West indicated that on March 3, he and Ms. Johnson tried to have Salter committed to the local psychiatric hospital for evaluation and treatment, but they were unable to do so, at least in part because neither Salter's wife (Brenda Salter) nor Salter's therapist (Bryant) would sign the probate petition.[6] Bryant recalls speaking to Dr. West, who let him know that Salter was in jail, and they discussed whether to commit Salter to the local psychiatric hospital. Bryant never visited with Salter at the jail, but Administrator

---

[5] Dr. West indicated the wrong February date in his notes, but nonetheless, documented the incident.

[6] Bryant testified that he believed a deputy should sign the petition for Salter in view of the criminal charges.

6

Mitchell was under the impression that medical staff requested Bryant's consultation.

In addition to prescribing medication and consulting with Bryant, Dr. West also instructed Ms. Johnson to remove Salter from suicide watch and put him on health watch. Ms. Johnson relayed this change to Administrator Mitchell and jail staff. Dr. West started health watch at the jail because he believed there were times where inmates needed to be watched more closely, but not necessarily stripped of all clothing, bedding, and other belongings. Inmates on health watch are subject to a heightened level of observation – monitored every 15 to 30 minutes – and are housed in an isolation cell near the front of the jail, not in the general population.

Pursuant to Dr. West's recommendation as communicated by Ms. Johnson, Salter received clothing and a blanket. He remained in an isolation cell at the front of the jail and at no time was placed in the general population. The jail gave Salter his prescribed medications starting on March 3.

Dr. West and Ms. Johnson also conferred with the arresting officer, Detective Klaetsch, to try to probate Salter and place him in a mental facility. Administrator Mitchell agreed with their efforts to probate Salter or to reduce his $50,000 bond so that he could be home and obtain further treatment.

From March 4 to March 8, Salter received and took his medications. Dr.

7

West and Ms. Johnson remained in communication regarding his condition.  The jail staff allowed Salter to call his wife more often than normally allowed.  Salter got upset after speaking to his wife because he was not getting out of jail.  During his conversations with his wife, Salter did not communicate suicidal thoughts to her.

Corrections Officer Greg Harrelson, a longtime friend of Salter's, visited him several times a day during his incarceration.  Officer Harrelson visited Salter approximately six to eight times per shift for about 10 minutes, and during that time tried to provide Salter with reassurance.

After Dr. West moved Salter to a health watch, a few incidents transpired.  On March 4, Salter complained to Ms. Johnson that he felt like the walls of his cell were closing in on him.  Ms. Johnson testified it was not uncommon for inmates to feel claustrophobic.  To alleviate his claustrophobia, Ms. Johnson arranged with Captain Trent to leave Salter's cell door open at recurring intervals for 20 to 30 minutes at a time while jail staff was present.

On March 5, Officer Harrelson found Salter lying on the floor complaining that ants were biting him.  When Ms. Johnson responded, she found no ants.  Because this incident occurred only minutes before Salter was due for Lortab, and because he felt better after receiving Lortab, Ms. Johnson believed Salter's behavior was a ruse to get her to hurry and administer his medication.

8

Salter had an episode on March 7, where he was on the floor and uncommunicative. Jail logs indicate that Corrections Officer Reed tried to contact Administrator Mitchell, and the logs also show Salter moved off the floor about 30 minutes later.

On March 9, the day of Salter's suicide, Captain Trent worked the day shift. As she left for the day, Captain Trent told Salter she would see him the next day, to which Salter responded "ok." During her shift on March 9, Officer Brown was covering for a sick employee so she was working in both dispatch and with the female section of the jail as needed. Officer Brown generally knew, through word-of-mouth, about Salter's past suicide attempts.

At 4:04 pm on March 9, Officer Brown passed out the food trays and spoke to Salter briefly. She returned to dispatch at 4:08 pm. By 4:13 pm, Officer Brown left the dispatch area to collect the food trays. When Officer Brown came to collect Salter's food tray, she found Salter hanging by his neck from a bedsheet tied to the top bunk. The control log indicates this was at 4:17 pm. Officer Brown summoned for help and Deputy Messer rushed in and immediately picked up Salter to take pressure off his neck. Officer Brown cut Salter down and she and Ms. Johnson performed CPR until emergency rescue arrived. There appears to be an 11-minute gap between the time Officer Brown discovered Salter and the time Emergency Medical Services was called at 4:28 pm. Ten minutes elapsed from the

9

time Emergency Medical Services was notified to the time it arrived in Salter's cell at 4:38 pm. Emergency Medical Services left the jail by 4:51 pm and arrived at the hospital by 4:53 pm. Salter died a few days later.

The jail had policies in place relating to suicide prevention at the time of Salter's death. Policy B-106 requires the booking agent screening a new detainee to "make certain that the arrestee is referred to the local mental health agency before he/she is placed in a housing unit . . .." Policy B-111 relates to suicidal arrestees and requires "an immediate referral . . . be made to the local mental health center and a face-to-face interview by a mental health professional will be requested." The policy further requires the suicidal arrestee to "remain in the holding cell, within view of the control center or booking officer," until the jail administrator determines he/she may be placed in a housing unit. Policy F-101 requires that inmates needing mental health services will be referred and the referral to be logged. Policy F-201 similarly requires that any arrestee exhibiting suicidal tendencies must be referred to the local mental health agency, which referral must be documented. The officer making the referral "should request a face-to-face evaluation of the inmate by a mental health professional as soon as possible." Additionally, Policy F-201 requires an inmate considered at risk to himself to be placed in an area with good supervision, and every 15 minutes the observation documented. Jail staff must follow directions from a mental health

10

professional regarding an inmate's treatment and to document and report changes in behavior as soon as possible to the shift supervisor or jail administrator.

## II. Legal Standard

We review *de novo* a district court's denial of a motion for summary judgment based on qualified immunity, "drawing all inferences and viewing all of the evidence in a light most favorable to the nonmoving party." Gilmore v. Hodges, 738 F.3d 266, 272 (11th Cir. 2013).

## III. Legal Analysis

### A. *Qualified Immunity*

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). "Because qualified immunity is a defense not only from liability, but also from suit, it is 'important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible.'" Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)

11

(quoting GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1370 (11th Cir.1998)).  To receive qualified immunity, the public official "'must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"  Id. (quoting Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991)).  In this case, no one disputes that Administrator Mitchell, Captain Trent, and Officer Brown were acting within the scope of their discretionary authority.

To avoid summary judgment based on qualified immunity, a plaintiff must show both that the defendant violated a federal right and that the right was already clearly established – given the circumstances – when defendant acted.  Id.  A federal right is "clearly established" when "'[t]he contours of [the] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  al-Kidd, 563 U.S. at 741 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  Id.; Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015).  "The burden of showing that an officer violated clearly established law falls on the plaintiff, and a plaintiff's citation of general rules or abstract rights is insufficient to strip a 1983 defendant of his qualified immunity."  Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000).

12

### 1. Deliberate Indifference

"In a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under the eighth or fourteenth amendment, the plaintiff must show that the jail official displayed *deliberate indifference* to the prisoner's taking of his own life." Jackson v. West, 787 F.3d 1345, 1353 (11th Cir. 2015) (emphasis in original) (quoting Edwards v. Gilbert, 867 F.2d 1271, 1274-75 (11th Cir. 1989)). This is a difficult standard for a plaintiff to meet. Popham v. City of Talladega, 908 F.2d 1561, 1563 (11th Cir. 1990). Jail suicides are akin to a failure to provide medical care. As such, deliberate indifference has become the "barometer by which suicide cases involving convicted prisoners as well as pretrial detainees are tested." Id.

To establish a defendant's deliberate indifference, a plaintiff must show "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Jackson, 787 F.3d at 1353 (quoting McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)). "[D]eliberate indifference requires that the defendant deliberately disregard 'a strong likelihood rather than a mere possibility that the self-infliction of harm will occur. The mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners.'" Snow v. City of Citronelle, Ala., 420 F.3d 1262, 1268-69 (11th Cir. 2005) (quoting Cook ex rel. Estate of Tessier v.

Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005)).  "A prison custodian is not the guarantor of a prisoner's safety."  Cagle v. Sutherland, 334 F.3d 980, 989 (11th Cir. 2003) (quoting Popham, 908 F.2d at 1564).

"[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  Farmer v. Brennan, 511 U.S. 825, 838  (1994) (rejecting assertion that "a prison official who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it."); Snow, 420 F.3d at 1270 (denying qualified immunity to jail officer, who was subjectively aware of the substantial risk of harm, and deliberately chose not to communicate that risk to others after his shift concluded or attempt to remedy the risk in any way).

Appellants contend the district court erred in assessing whether they were deliberately indifferent based on their collective knowledge.  It is well-settled that to determine whether a specific defendant was deliberately indifferent, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows."  Jackson, 787 F.3d at 1353 (quoting Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008)).

14

*a. Deliberate Indifference Prong 1: Subjective Knowledge*

In assessing the first prong, the question is whether Administrator Mitchell, Captain Trent, and Officer Brown each had "personal, subjective knowledge of a suicide risk." See Jackson, 787 F.3d at 1356-57 n.6.

*1. Administrator Mitchell*

Administrator Mitchell was aware that Salter had previously been committed. Administrator Mitchell knew generally that Salter had attempted suicide, without knowing the details of when those attempts had taken place. Administrator Mitchell testified he believed Bryant had examined Salter during the March incarceration. As such, he believed that Dr. West and Bryant had agreed that Salter need not be on suicide watch. Administrator Mitchell did not contact Bryant directly regarding Salter's treatment. Ms. Johnson, the nurse, testified she told Administrator Mitchell that Dr. West had recommended that Salter be removed from suicide to health watch. Administrator Mitchell relied on Dr. West's recommendation regarding Salter's condition. Although Dr. West's notes described Salter's suicide attempt on February 25, 2010, there is no evidence Administrator Mitchell read them. He testified he did not usually read medical notes and relied on the medical doctor and nurse to make recommendations to him.

Administrator Mitchell had knowledge regarding some of Salter's erratic behavior while detained. When on March 2, Salter was banging his head, Officer

15

Brown placed Salter in the jail's restraint chair.  She advised Ms. Johnson, and Administrator Mitchell.[7]  Administrator Mitchell agreed this behavior indicated that Salter had emotional issues.  On March 5, Corrections Officer Harrelson found Salter lying on the floor claiming ants were biting him, and there were no ants. Administrator Mitchell was aware of this incident.  On March 7, corrections officers discovered Salter lying on the floor and uncommunicative. The notes indicate Administrator Mitchell was called several times, but that the officer did not reach him.

### 2. *Captain Trent*

Captain Trent was aware that Salter had been arrested in the past and had general knowledge that Salter previously attempted suicide.  Ms. Johnson informed Captain Trent that she believed Salter should be kept on suicide watch until he met with Dr. West.  Captain Trent knew about the incident where Salter complained the walls were closing in and she worked with Ms. Johnson to alleviate his claustrophobia.  On March 9, Captain Trent was aware that Salter was upset and wanted to call his wife to ask her to make the bond.

### 3. *Officer Brown*

Officer Brown was also aware of Salter's mental state.  She understood that

---

[7] Administrator Mitchell testified that this is the sort of behavior that would have been brought to his attention, although by the time his deposition was taken, he had no specific recollection of this event.

16

he had been on suicide watch from the sheet hanging on the wall outside his cell and from information provided by Dr. West and the nurse, Ms. Johnson. Officer Brown knew that Salter had been in jail in the fall of 2009. She knew that Salter was committed to a mental health facility after his 2009 jail stay. She knew that Salter had stabbed himself at home and that he threatened suicide in February 2010. Officer Brown learned this from other jail staff and from the log books. Officer Brown testified that Salter would go from highs to lows; he was unhappy, felt lonely, and abandoned.

On March 2, Officer Brown placed Salter in a restraint chair when he was banging his head on the wall. She knew that Dr. West evaluated Salter on March 3 and that he resumed Salter's Xanax and Lortab prescriptions. Officer Brown was aware that Dr. West recommended switching Salter from suicide to health watch. Officer Brown was not aware of any incidents that occurred after Dr. West moved Salter to health watch from March 4 until his death.

The evidence of subjective knowledge differs in degree as to each Defendant. The Court, however, need not decide whether there is sufficient evidence of subjective knowledge as to each Defendant. This case turns on whether the Defendants were deliberately indifferent to Salter's safety by removing him from suicide watch consistent with the doctor's recommendation or by disregarding the risk of suicide by conduct that goes beyond negligence.

17

### a. Deliberate Indifference Prongs 2 & 3: Disregard of that risk by conduct that is more than negligence

"In a prison suicide case, deliberate indifference requires that the defendant deliberately disregard 'a strong likelihood rather than a mere possibility that the self-infliction of harm will occur. [T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners.'" Snow, 420 F.3d at 1268 (quoting Tessier, 402 F.3d at 1115).

Upon Salter's arrival at the jail, Salter was put in isolation and reportedly placed on suicide watch. There is some question as to whether or not all suicide watch protocols were followed because at one point Salter had a blanket in his cell. That being said, no injury occurred while Salter was reportedly on suicide watch. Salter's death occurred after he was taken off suicide watch and was instead placed on health watch, pursuant to the physician's recommendation. We will examine whether Defendants' actions in following the doctor's recommendation and whether Defendants' care of Salter on health watch warrant a denial of qualified immunity.

### 1. Did Defendants' reliance on a general practitioner constitute deliberate indifference?

Plaintiff contends that Administrator Mitchell's and Captain Trent's reliance on Dr. West, a general medical practitioner, and not a mental health professional, establishes deliberate indifference. To support this argument, Plaintiff relies on

18

written jail policies providing that inmates with a history of attempted suicide "be referred to the local mental health agency as soon as possible" and that the referring officer "request a face-to-face evaluation of the inmate by a mental health professional as soon as possible." The record evidence shows that Dr. West spoke to Bryant[8] over the phone about Salter's condition and about the possibility of having Salter committed. Defendants' failure to expressly request an in-person evaluation by Salter's therapist – in light of written jail policies – "does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence." See Taylor v. Adams, 221 F.3d 1254, 1259 (11th Cir. 2000). A mere violation of a local government's policy does not necessarily implicate a constitutional violation. See Virginia v. Moore, 533 U.S. 164, 173 (2008). The evidence showing Dr. West contacted Bryant sufficiently defeats a showing of deliberate indifference. See Howell v. Evans, 922 F.2d 712, 723 (11th Cir. 1991), vacated by settlement, 931 F.2d 711 (11th Cir. 1991), reinstated by order, 12 F.3d 190 (11th Cir. 1994) (emphasis omitted) (stating prison officials may rely on medical personnel for clinical determinations).

Plaintiff relies on Greason v. Kemp, 891 F.2d 829, 834 (11th Cir. 1990), to argue that a failure to provide adequate psychiatric treatment amounts to deliberate

---

[8] Although Ms. Johnson unequivocally testified that she contacted Bryant, Bryant does not recall speaking to her. Viewing the facts in the light most favorable to the Plaintiff, the Court will assume that Bryant did not speak to Nurse Johnson.

19

indifference in violation of the Eighth Amendment.  See also Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989) (stating that grossly inadequate psychiatric care or choice of an easier but less efficacious course of treatment can constitute deliberate indifference).[9]  Plaintiff argues that Administrator Mitchell's and Captain Trent's failure to obtain a psychiatrist or mental health professional consultation amounts to deliberate indifference in view of the rule stated in Greason and Waldrop.  The Eleventh Circuit, however, subsequently analyzed Greason in Campbell v. Sikes, 169 F.3d 1353, 1365 (11th Cir. 1999), and held that deliberate indifference hinged on the doctor providing "grossly inadequate medical care 'and, moreover that *he realized that he was doing so at the time*.'"  Campbell, 169 F.3d at 1365 (quoting Greason, 891 F.2d at 835) (emphasis in original).

The record does not establish Greason's two prongs.  Defendants' administrative decision to move Salter into a health watch was based on Dr. West's evaluation, after he examined Salter two days after his arrest.  Dr. West was an experienced physician treating inmates.  He was familiar with Salter's medical and mental health history.  He was responsible for prescribing and managing Salter's psychiatric medication.  Dr. West's extensive notes show he spent much time attempting to help Salter's condition improve.  He also unsuccessfully attempted to

---

[9] Greason and Waldrop were decided before Farmer, which requires subjective awareness of the relevant risk and rejects a solely objective test of deliberate indifference.  See Steele v. Shah, 87 F.3d 1266, 1270 n.2 (11th Cir. 1996) (recognizing that Greason and Waldrop based their holdings on evidence of subjective awareness and therefore are still valid precedent in view of Farmer's rejection of an objective-awareness test for deliberate indifference).

convince Bryant and Brenda Salter to sign the paperwork to have Salter committed to a mental health facility. Defendants' reliance on Dr. West, as opposed to a mental health professional, cannot be said to be grossly inadequate.

In addition, this record does not show that Defendants thought they were providing sub-par psychiatric care at the time. Administrator Mitchell knew that Dr. West was in contact with Bryant, and believed Bryant had visited with Salter. Defendants were aware that the physician and nurse had resumed Salter's prescription medications, which seemed to alleviate some of his symptoms. Defendants also knew they were closely monitoring Salter under the jail's health watch protocol. Finally, Defendants were aware that Dr. West and Ms. Johnson had set the wheels in motion to try to get Salter committed to a mental health institution. Certainly, they did not realize that his care might have been inadequate, if indeed it was.

### 2. *Did the temporal proximity of past suicide attempts establish deliberate indifference?*

Plaintiff also contends that Salter's past suicide attempts were so recent that not keeping Salter on suicide watch showed deliberate indifference. In this case, Salter's most recent suicide attempt was 12 days before his death. The record shows that Administrator Mitchell and Captain Trent had general knowledge of Salter's past suicide attempts and mental health condition, but not specifically that he tried to take his life 12 days earlier.

21

Although Officer Brown knew of the February 2010 attempt, she also knew he was receiving medication and was being continuously monitored. She also had not witnessed any behavioral issues in the three days leading up to the suicide after the doctor visited with him. Therefore, the Court cannot find that Officer Brown's awareness of Salter's most recent suicide attempt equates to deliberate indifference on her part.

### 3. Does the failure to continuously monitor Salter constitute deliberate indifference?

The health watch required corrections officers to check on Salter every 15 to 30 minutes. The evidence shows that Officer Brown saw and spoke to Salter at about 4:00 pm, when she delivered his food tray. There is evidence in the control log that Salter was found at 4:17 pm, but Officer Brown says she found him at 4:28 pm, 28 minutes after delivering his food tray. The evidence points to Salter being found sometime between 4:17 pm and 4:28 pm and rescue arrived 10 minutes later at 4:38 pm. See Popham, 908 F.2d at 1565 (stating that a failure to watch prisoners at all times does not constitute deliberate indifference). The evidence in this case shows that Officer Brown monitored Salter in a manner consistent with the health watch protocol, every 15 to 30 minutes. Certainly, that does not rise to the level of deliberate indifference. To hold otherwise would impose on all corrections officials the obligation to constantly monitor inmates with mental health problems every minute of every hour, 24 hours per day. The Constitution does not impose

22

such a requirement.

> ### 4. Did the failure to put Salter on suicide watch after he exhibited certain behavior constitute deliberate indifference?

The next question is whether Salter's behavior after being placed on health watch should have alerted Defendants of a strong likelihood, rather than a mere possibility of self-infliction of harm. After being placed on health watch, Salter complained the walls were closing in on him and he also thought ants were biting him. At one point, he did not get up off the ground and refused to speak for at least 30 minutes. Ms. Johnson was aware of these incidents and she attempted to alleviate Salter's symptoms. She worked with Captain Trent to alleviate his claustrophobia, by having his cell door open at intervals. She believed the ant biting incident was a ploy by Salter to get medication and she continued to give him medication as prescribed. Administrator Mitchell also allowed Officer Harrelson, Salter's friend, to visit and comfort Salter. Also, while on health watch, Salter remained in an isolation cell at the front of the jail, and not in the general population.

This Court finds Salter's behavior after being placed on health watch does not evince a "strong likelihood" that he would harm himself. Rather these incidents appear to be symptomatic of the incarceration of a mentally ill inmate, which the jail staff attempted to alleviate consistent with a physician's

23

recommendation.  Their actions do not demonstrate deliberate indifference, but quite the contrary, they show concern for the detainee.

## IV. Conclusion

At the time of Salter's suicide, decisional precedent had clearly established that a jailer acts with deliberate indifference if he has subjective knowledge of a strong likelihood that an inmate would attempt suicide and deliberately fails to take any action to prevent that inmate's suicide.  See Snow, 420 F.3d at 1270.  Ms. Salter has not met her burden of pointing to any case law that says "beyond debate" that jail staff is not allowed to rely on a general practitioner's determination about an inmate's mental health.  The facts here do not show that Defendants violated clearly established law nor that they acted with deliberate indifference while monitoring Salter on a health watch.  Therefore, the judgment of the district court is reversed and remanded with instructions to find that the three Defendants are protected under the law of qualified immunity from suit and liability under the facts of this case.

REVERSED and REMANDED.